594 F.2d 356
 4 Media L. Rep. 2599
 Philip J. HIRSCHKOP, Appellant,
and
American Civil Liberties Union of Virginia and Richmond
Newspapers Professional Association, Plaintiff-Intervenors,
v.
Hon. Harold F. SNEAD, Hon. Lawrence W. I'Anson, Hon. Lee
Carrico, Hon. Albertis S. Harrison, Hon. Alexander M.
Harman, Jr., Hon. George Cochran, and Hon. Richard H. Poff,
in official and Individual capacities, Appellees.
 No. 76-2016.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 3, 1978.
Decided March 2, 1979.
 
 Philip J. Hirschkop, Alexandria, Va. (John D. Grad, Hirschkop & Grad, Alexandria, Va., Jeremiah S. Gutman, New York City, Richard C. Shadyac, Fairfax, Va., on brief), for appellant.
 John W. Riely, Richmond, Va. (James E. Farnham, Jack E. McClard, Hunton & Williams, Richmond, Va., on brief), for appellees.
 Before HAYNSWORTH, Chief Judge, and WINTER, BUTZNER, RUSSELL, WIDENER, HALL, and PHILLIPS, Circuit Judges, sitting En banc.
 PER CURIAM:*
 
 
 1
 This case presents the question of whether rule 7-107 of the Virginia Code of Professional Responsibility[1] which restricts lawyers' comments about pending litigation violates the right of freedom of speech secured by the first and fourteenth amendments.[2] The district court issued a declaratory judgment upholding the constitutionality of the rule.[3] We affirm in part and reverse in part.
 
 
 2
 Upon petition of the Virginia State Bar, the Supreme Court of Virginia promulgated rule 7-107 pursuant to authority conferred by Virginia Code § 54-48 (1974). The rule reflects long-standing concern that prejudicial publicity threatens the fairness of trials. Canon 20 of the American Bar Association's Canons of Professional Ethics, the predecessor of the rule, indicated generally that published statements by a lawyer during the course of litigation may interfere with a fair trial and are usually to be condemned. In 1964 the American Bar Association, responding in part to the events following the assassination of President Kennedy, appointed an advisory committee on fair trial and free press whose final report contained the prototype of those parts of rule 7-107 pertaining to criminal trials. See ABA Standards Relating to Fair Trial and Free Press (1968). A committee of the Judicial Conference of the United States also issued a report, recommending that district courts adopt local rules based largely on the Bar Association's standards. See Report of the Committee on the Operation of the Jury System on the "Free Press Fair Trial" Issue, 45 F.R.D. 391 (1968). Subsequently, the Bar's standards were adopted in Virginia and in other states, and they were incorporated into the local rules of many federal courts.
 
 
 3
 Much of the litigation about restrictions on the publication of news about trials has involved specific gag orders and not rule 7-107. See, e. g., Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Central South Carolina Chapter, Society of Professional Journalists v. Martin, 556 F.2d 706 (4th Cir. 1977); In re: Oliver, 452 F.2d 111 (7th Cir. 1971); See generally, Symposium, National Press Association v. Stuart, 29 Stanford L.Rev. 383-626 (1977). The constitutionality of rule 7-107 apparently has been considered by only one appellate court. That court found the rule to be constitutionally infirm primarily because of its failure to restrict the ban on lawyers' comments to those instances where they posed a serious and imminent threat to a fair trial. Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 251 (7th Cir. 1975). We disagree. The more appropriate standard is that the publication present a reasonable likelihood that it will be prejudicial to the fair administration of justice.
 
 I.
 
 4
 At the outset, we consider whether Philip J. Hirschkop, an attorney licensed to practice in Virginia, has standing to maintain this action even though no complaints charging violations of rule 7-107 are pending against him.
 
 
 5
 All attorneys in Virginia must belong to the Virginia State Bar which processes complaints about violations of the rule. Virginia Code § 54-49 (1974). Hirschkop brought this action, alleging that the rule is unconstitutional on its face and as applied to him. Eleven of the 22 complaints filed with the Virginia State Bar from 1965 to 1975 charging violations of the rule cited Hirschkop, who has been active in many civil rights and civil liberties cases. One complaint was filed after he did no more than tell the press that he was representing an indicted prison official because the official was "a good guy."Eventually, Hirschkop and the Virginia State Bar reached a settlement in which the executive committee of the Bar admitted that the complaints against Hirschkop were meritless and had been filed in cases where "the complainants may have disagreed with the causes supported and espoused" by Hirschkop. In return, Hirschkop consented to dismissal of his claims against the State Bar, its officers, and employees. The agreement, however, did not deal with the rule's constitutionality, and it expressly provided that Hirschkop would not be immune from appropriate disciplinary action in the future should he violate the rule. Consequently, the only issue presented in this appeal is the facial constitutionality of rule 7-107.[4]
 
 
 6
 The Supreme Court has consistently relaxed normal standing requirements in first amendment cases. See, e. g., Broadrick v. Oklahoma, 413 U.S. 601, 611-13, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Dombrowski v. Pfister, 380 U.S. 479, 486-87, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); N.A.A.C.P. v. Button,371 U.S. 415, 432-33, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The Court justified this exception to the general rule of standing by explaining in Broadrick,413 U.S. at 612, 93 S.Ct. at 2916:
 
 
 7
 Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.
 
 
 8
 This policy is particularly strong when, as here, only speech and not conduct is at issue. See Broadrick, 413 U.S. at 615, 93 S.Ct. 2908.
 
 
 9
 Hirschkop is subject to discipline, including disbarment, for comments violating rule 7-107. We conclude that he has standing to challenge the rule because the threat of disciplinary action may deter him and other Virginia attorneys from making constitutionally protected statements.
 
 II.
 
 10
 Hirschkop suggests that the first amendment precludes any rule limiting speech by lawyers. He contends that fair trials can be obtained even when prejudicial publicity is imminent by carefully drawn orders confining restrictions on speech to the peculiar circumstances confronting the trial judge.
 
 
 11
 Hirschkop's rejection of every rule regulating lawyers' comments will not withstand constitutional analysis. The first amendment's right of freedom of speech is not absolute, and courts must consider the "special characteristics of the . . . environment" in which the speech is uttered. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Drawing on many prior decisions, Mr. Justice Powell formulated a two-step test in Procunier v. Martinez, 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), for determining the constitutionality of governmental restrictions on speech:
 
 
 12
 First, the regulation . . . in question must further an important or substantial governmental interest unrelated to the suppression of expression. . . . Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.
 
 
 13
 There can be little question whether rule 7-107 satisfies the first part of the test prescribed by Martinez. State and federal courts have a substantial interest in assuring every person the right to a fair trial, a right which the Supreme Court has described as "the most fundamental of all freedoms." Estes v. Texas, 381 U.S. 532, 540, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543 (1965). Experience shows that this right can be impaired by lawyers' unrestrained, prejudicial comment pending trial. See Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); ABA, Standards Relating to Fair Trial and Free Press (1968); Report of the Committee on the Operation of the Jury System on the "Free Press Fair Trial" Issue, 45 F.R.D. 391 (1968). Consequently, we conclude that the rule furthers a "substantial governmental interest unrelated to the suppression of expression."
 
 
 14
 The second part of the Martinez test is designed to determine whether the restrictions on speech are "unnecessarily broad." 416 U.S. at 413-14, 94 S.Ct. 1800. In the context of this case, Martinez prohibits the imposition of all such restrictions that are not essential to the preservation of a fair trial. Application of this part of the Martinez test requires an examination of both the scope of the rule and the nature of its restrictions. Consideration of the rule's scope is necessary because it applies to criminal, civil, and administrative proceedings. Inquiry about its restrictions is essential because the parties differ on the appropriate constitutional standard for determining what comments should be barred. Therefore, we will apply the second part of the Martinez test to each type of proceeding to which the rule refers.
 
 III.
 Criminal Jury Trials
 
 15
 The committee of both the American Bar Association and the Judicial Conference of the United States emphasize that prejudice from lawyers' unrestrained comments is most likely to occur in criminal cases which are heard by a jury. See ABA, Standards Relating to Fair Trial and Free Press 22 (1968); Report of the Committee on the Operation of the Jury System, "Free Press-Fair Trial Issue", 45 F.R.D. 391, 392 (1968). Addressing the problem in Nebraska Press Association v. Stuart, 427 U.S. 539, 551, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1976), the Chief Justice noted:
 
 
 16
 In the overwhelming majority of criminal trials, pretrial publicity presents few unmanageable threats to this important right. But when the case is a "sensational" one tensions develop between the right of the accused to trial by an impartial jury and the rights guaranteed others by the First Amendment.
 
 
 17
 Of course, even widespread publicity does not taint every sensational trial. See, e. g., Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); Wansley v. Slayton, 487 F.2d 90 (4th Cir. 1973). The passage of time or other circumstances may dissipate the harm. Nevertheless, the danger to fair trials is illustrated by several decisions of the Supreme Court reversing convictions because of prejudicial publicity stemming in part from lawyers' comments. See, e. g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).
 
 
 18
 The Honorable Bernard S. Meyer, a member of the American Bar Association's Advisory Committee on Fair Trial and Free Press which drafted the ABA standards, was the principal expert witness supporting the rule in this case. His testimony, based largely on the committee's commentary about the standards, discloses that with respect to criminal cases, the danger of prejudicial publicity creates a substantial threat to fair jury trials. Judge Meyer also explained that the American Bar Association committee relied heavily on Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), where the Court emphasized the importance of rules and regulations in assuring fair trials:
 
 
 19
 The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, (nor) counsel for defense . . . should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.
 
 
 20
 The threat of prejudicial publicity is particularly acute in sensational cases when the press reports information gleaned from lawyers about confessions, incriminating evidence, and the accused's background. Moreover, since this information is likely to be uncovered during the investigatory stages of the proceedings before the charges come to the attention of the trial judge, it is difficult for a court to protect the accused by entering orders restricting comments on an Ad hoc basis.
 
 
 21
 Since less intrusive means of assuring the fundamental right to a fair trial are inadequate, we conclude that a properly drawn rule restricting lawyers' comments about pending criminal prosecutions can be justified by the need to protect the right to a fair jury trial. Consequently, we next examine rule 7-107 to determine whether it otherwise conforms with constitutional standards governing the restriction of speech.
 
 
 22
 Read without embellishment, rule 7-107 prohibits lawyers from commenting on certain subjects during the pendency of criminal proceedings. Apparently the ABA Standards, which are the prototype of the rule, were designed to ban such comment absolutely. See Hirschkop v. Virginia State Bar, 421 F.Supp. 1137, 1154-56 (E.D.Va.1976). Counsel for the appellees urge, however, that the rule should be read with a gloss that prohibits only those comments which are reasonably likely to interfere with the administration of justice. Hirschkop argues that a properly drawn rule can bar only those comments that present a clear and present danger to a fair trial.
 
 
 23
 Before the specific recommendations of the Reardon Committee of the American Bar Association and of the Judicial Conference of the United States were formulated and adopted, there were some restrictions upon comments for publication by lawyers and others respecting pending litigation. Old Canon 20 of the Code of Professional Responsibilities[5] addressed the subject insofar as lawyers were concerned. Everyone may have been subject to a contempt citation for speech amounting to an obstruction of justice in state courts.[6] The trouble was that the standards were so general and vague that they were exceedingly difficult to apply and did little to forewarn speakers for publication about what was proscribed and what was permitted. Not unnaturally the Supreme Court in Bridges v. California held that publications could not be held contemptuous of the court unless they posed a clear and present danger or a serious and imminent threat to the administration of justice. To some today, it may seem surprising that Chief Justice Stone and Justices Roberts, Frankfurter, and Byrnes thought that a reasonable likelihood of interference with the fairness and impartiality of judicial proceedings would suffice, but as long as the standards were so general and unspecific, and in the presence of First Amendment rights, punishment should be meted out only to the most flagrant offenders.
 
 
 24
 These rules, with their stringent tests for culpability necessitated by the First Amendment, were inadequate to protect judicial processes from the kind of extraneous influences which impaired their fairness or objectivity or created the appearance of such unfairness. The extensive press reports which deprived the trial of Dr. Sheppard of fairness to such an extent that his conviction was held to be in violation of his due process rights[7] is but illustrative. The seriousness of the problem, however, led the Supreme Court to include the passage, quoted earlier, that "courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interference." The Court then focused upon the performance of the lawyers in the litigation. Neither a prosecutor nor counsel for the defense nor others within the court's jurisdiction "should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures."
 
 
 25
 The Reardon Committee of the American Bar Association picked up the Supreme Court's suggestion[8] and undertook to impose restraints upon statements for publication by lawyers engaged in the preparation for trial and trials of criminal cases.[9] The report of that Committee, after its approval by the American Bar Association and now widely adopted by the states, contains no restraints upon the press. The press may publish any information in its possession as far as these rules are concerned, but the lawyers are directed to try their cases in the court and not in the press. This is a desideratum often repeated,[10] and, generally, it is essential to fairness in the conduct of criminal trials and the protection of rights of due process.
 
 
 26
 Lawyers are officers of the court, subject to reprimand and the imposition of other disciplinary sanctions for the violations of rules to which non-lawyers are not subject. The lawyer is under a high fiduciary duty to fairly represent his client, but he owes substantial duties to the court and to the public as well. If blind loyalty to his client demands that the lawyer knowingly misrepresent facts, his duty to the court and the public requires that he not. The lawyer, as well as the judge, has the duty to the court, to the litigants in the particular case, to litigants in general and to the public to protect the judicial processes from those extraneous influences which impair its fairness. In Estes v. Texas, 381 U.S. 532, 540, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543 (1965), the Supreme Court referred to the right to a fair trial as "the most fundamental of all freedoms." As an officer of the court, it is a lawyer's duty to protect and preserve that right, and he is censurable, as the Supreme Court said in Sheppard v. Maxwell, when he acts to frustrate that right.
 
 
 27
 Lawyers have First Amendment rights of free speech. They are not second class citizens. They are first class citizens with many privileges not enjoyed by other citizens. With privilege, however, goes responsibility, and codes of professional responsibility have traditionally recognized that a lawyer is subject to special disciplinary sanctions when he neglects his responsibility to his clients and to the public. He is equally subject to disciplinary sanctions when he violates his responsibilities to courts, to other litigants and to the public when he invokes extraneous influences to deprive judicial processes of fairness.
 
 
 28
 Thus, the Reardon Committee picked up the Supreme Court's suggestion or direction and focused its attention upon the conduct of lawyers. Instead of the vague and generalized rules of the past, a rule was formulated which, when adopted by the Supreme Court of a state, would amount to a legislative finding that speech for publication about enumerated things by a lawyer engaged in pending or contemplated litigation was so inherently prejudicial that it may be proscribed. Release by a prosecutor to the press of the prior criminal record of a person charged with a crime is illustrative. At the time of release, the prosecutor may not know whether at the time of trial the defendant will wish to remain silent, will not put his credibility in issue and thus have the right that the jury not be informed of his prior record, but he knows that if the defendant at trial does choose not to put his credibility in issue, the jury may not be informed of the prior record. It is the kind of release by a prosecutor that is so inherently prejudicial to the defendant that it ought to be subject to sanctions. This is so, even though the prejudice itself may be wholly or partially avoidable. Transfers of venue, long postponements of trial and the submission of a large array of jurors to searching and extensive voir dire examinations are tools that have been employed in earnest attempts to avoid such prejudice, but the prosecutor is censurable for creating the necessity for the employment of such tools. And use of the tools themselves may impinge upon other substantial rights of a defendant, such as the right to a speedy trial. Moreover, though the court may later conclude that the means employed has so succeeded in avoiding the effects of the prejudice that the defendant may be put to trial without violation of his right to due process, the defendant may be left with such doubt of the impartiality of the jury that he may feel compelled to waive his right to trial by jury.[11] No matter the eventuality, the fairness and integrity of the judicial process has been affected by the speech for publication, and the lawyer ought to be censurable for his highly irresponsible conduct.
 
 
 29
 So much may also be said for the other proscriptions of Rule 7-107(B). The release of the contents of a written confession, for instance, is equally reprehensible, for the prosecutor who releases the contents of such a confession for publication cannot know, until the court rules upon it, whether or not the confession will ever be admitted in evidence and its contents made known to a jury. If the integrity of the judicial process is to be maintained, the results of lie detector and other tests must be protected until the court has had an opportunity to rule upon their admissibility.
 
 
 30
 One may strain to imagine technical violations of these rules which ought not to result in the imposition of sanctions, or even in charges, but they are not easy, and they would be extraordinary. If James Earle Ray should again escape from prison in Tennessee and be recaptured, it may be that no substantial right of his would be adversely affected if the prosecutor announced that he had been serving a sentence for the murder of Martin Luther King. Ray is so widely known as the convicted murderer of King that republication of the fact would be new information to few people. Even if the prosecutor did not inform the press that Ray was serving a sentence for the murder of King, the press would know it and would report the fact of his earlier conviction when it reported his escape and recapture. At the very best, the state at the time of trial would be entitled to prove that he had escaped from a penal institution in which felons were confined. There are few defenses to such charges of escape; a jury trial court be unlikely,[12] and when a jury, at best, would be informed that he had a record as a felon, specification of the offense might have little potential prejudicial effect.
 
 
 31
 If we may imagine situations which would be technical violations of the rules, though innocuous, they are adequately handled by the requirement of a reasonable likelihood that the speech for publication will be prejudicial to a fair trial. The express prohibitions of the rule are not explicitly qualified. Seemingly, the drafters concluded that the potential for prejudice was so inherent and so great in the prohibited speech for publication situations that no qualification was necessary. Since, however, one may imagine some situations which ought not to result in the filing of charges, some qualification is necessary. It is obvious from a reading of the entire rule that the drafters were concerned with speech for publication which had a reasonable likelihood of interference with a fair trial. It does not strain the language of the rule to treat that qualification as implicit in each of the expressed prohibitions. It is made particularly easy in this instance because we are assured that the Supreme Court of Virginia so construes the rule.
 
 
 32
 If some qualification of expressed prohibitions is necessary, however, we find no basis for a conclusion that the Constitution of the United States requires a tighter standard than that implicit in the rules themselves. The only reason for any qualification at all is to take care of the unusual case in which, because of extraordinary circumstances, there is no likelihood of a prejudicial effect. It is simply wrong for a prosecutor, in a sensational murder case, to announce to the public through the press that he has obtained a full confession from one charged with the crime. It would gravely threaten the integrity of the subsequent proceedings if the confession is suppressible and held to be inadmissible in evidence against the defendant. Because of that possibility, the reasonable likelihood test is met, but there is present only a potential for prejudice which may not eventuate if the defendant decides not to contest the admissibility of his confession or, having contested it, the court rules against him. Thus, we are not certain that any clear and present danger or serious and immediate harm test would be met, and we see no reason for injecting into the rules the uncertainties which the imposition of one or both of those standards would occasion. The prosecutor who publicizes the fact of such a confession knows the publication threatens the integrity of the court's processes. He knows that it is wrong for him to do it, and the court should have the power to prohibit his doing it without extended controversy over the immediacy and gravity of the threatened harm in the particular case.
 
 
 33
 Indeed, that is one of the virtues of the rules. They tell the lawyers what they may publicize as well as what they may not. With the reasonable likelihood of interference qualification, the rules seem to be as definite as any set of rules may be. The clarity of their guidance to lawyers is marked. But the injection of any other standard would make the prohibition, which is now clear and definite, to some extent unclear and gray.[13] The reason for the injection of any qualification at all does not require that result as a matter of constitutional doctrine.
 
 
 34
 Our concern, of course, is with speech and the First Amendment guaranty of its freedom, but the guaranty is not unqualified.
 
 
 35
 This is not a prior restraint situation. In the generally accepted sense, a prior restraint is one imposed by a judicial decree, a violation of which is summarily punishable as a contempt. There is no such prejudgment in any such sense in these rules. They inhibit speech within the clearly defined prohibitions, but such inhibitions inhere in every situation within the exceptions to the constitutional guaranty of freedom of speech. Such inhibitions inhere in our laws against defamation and in the principle that one may not falsely shout "fire" in a crowded theatre. Here sanctions may be imposed upon a lawyer only after charges have been filed against him, he has been given a due process hearing and has been found guilty. Perhaps the inhibition is greater here than in some circumstances because of the relative definitiveness of the prohibitions of these rules, but their clarity in that respect avoids problems of vagueness. That ought not to provoke the imposition of a constitutional standard devised for and applicable to judicial prejudgments.
 
 
 36
 The clear and present danger test, of course, is appropriate in other situations than judicially imposed prior restraints. Mr. Justice Holmes and Mr. Justice Brandeis were of the opinion that such a test was a constitutional requisite in a prosecution under California's Criminal Syndicalism Statute.[14] They were properly concerned that a substantial distinction be drawn between the theoretical teaching of the virtues of proletarian revolution contemplated for the far distant future and conspiracies and associations for the accomplishment of immediate criminal activity. They concurred in the judgment affirming the conviction, however, because of the presence of evidence that an object of the conspiracy was the commission of present serious crimes and that the conspiracy would be furthered by the activity of the society to which the defendant belonged. Earlier it had been held that such a test was appropriate in a prosecution under the Federal Espionage Act of 1917 of the secretary of the Socialist Party who was circularizing men called for military service for the purpose of influencing them to obstruct the draft.[15] The test was held to have been met there. Finally, such a test has been held appropriate when a court attempts to punish a speaker under the court's general contempt power.[16] With the exception of Bridges' telegram to the Secretary of Labor, those cases involved editorials and articles in newspapers critical of the court. In Pennekamp v. Florida and Craig v. Harney the criticism was of past conduct and rulings by the court; an area in which the press enjoys a large, if not a full, measure of freedom. In Bridges the publications do relate to judicial proceedings not yet ended, but such things as the rather mild expression of the opinion of the editor that the criminal defendants should not be granted probation and that the community needed the example of their confinement as felons should not result in the summary imposition of penal sanctions unless some exacting standard is met. The freedom of the press to report judicial proceedings and to criticize a judge when what the judge does seems wrong to the press ought to be uncurbed, and expressions of opinion about what it should do when the judge has not yet acted ought not to be regarded as a contemptuous interference with judicial proceedings when there is no clear and present threat to the integrity of the judicial processes.
 
 
 37
 In those cases, the contempt power of the court had been invoked and punishment imposed on the basis of vague and general standards. Because of their generality and vagueness, members of the press should not be punished unless their offense be flagrant and done under such circumstances that they should have realized that they were threatening the integrity of the judicial process. Our situation here is wholly incomparable, for we deal only with speech for publication by lawyers and with rules which are quite explicit in informing them what they may and may not say for publication. No heavier or stiffer standard than the reasonable likelihood test is needed to protect them from disciplinary sanctions for speech for publication without adequate notice of the consequences.
 
 
 38
 In Sheppard v. Maxwell the Supreme Court stated that "where there is a reasonable likelihood the prejudicial news" would prevent a fair trial, the judge should take remedial action or grant a new trial. The statement was made with respect to the action the court should take to retrieve the situation after the harm is done, but the Court, in Sheppard v. Maxwell, also stated that the court must adopt rules and regulations which avoid the harm in the first place. If remedial action is required on the basis of a reasonable likelihood test, and it is, the rules for the avoidance of the harm must be considered under the same test. Implicitly if not explicitly, the Supreme Court must have approved the reasonable likelihood standard for the application of the preventive rules. The rules would be meaningless if sanctions could be imposed only when the lawyer's published speech creates unremediable prejudice. They have meaning and appropriateness when so applied as to prevent the lawyer's creation of a reasonable likelihood for prejudice by a violation of one of the expressed prohibitions. We know of no good reason why the court may not forbid the lawyer from intentionally creating grave due process problems, and we are unaware of any constitutional requirement that forbids the court from protecting the integrity of its processes to that extent.
 
 
 39
 Rules governing the conduct of lawyers cannot provide a complete answer to the problem of pre-trial publicity with adverse impact upon the judicial process. Police officers may speak, and sometimes do, though one gets the impression that their exercise of restraint is on the increase. Members of the press may have other sources of information. But if police officers may create problems requiring extraordinary measures to avoid prejudice, that fact supplies no reason for thinking that lawyers may do it. Lawyers are officers of the court and, as discussed above, they have very special responsibilities for lending support to maintenance of the integrity of the judicial system. The mores of the marketplace are not the measures for the conduct of lawyers and judges, and lawyers may be held to higher standards than policemen.
 
 
 40
 Some concern has been expressed that the rule may preclude a lawyer for a defendant from stating for publication that in his opinion the statute under which the defendant is charged is unconstitutional and that he plans to defend on that ground. We do not so read the rule. Rule 7-107(C)(11) specifically says that a defense lawyer may state for publication that his client denies the charges. This would seem to include denials on legal, as well as, factual grounds. Moreover, the whole thrust of the rule is to protect the integrity of the factfinding process. The specific prohibitions are strictly directed to that end, and none of them seem capable of a construction which would preclude lawyers from publicly discussing the constitutionality or the fairness of the statute upon which pending criminal charges were founded.
 
 
 41
 As noted at the end of the introductory section, a majority of a panel of the Seventh Circuit came to a different conclusion. Chicago Council of Lawyers v. Bauer, 522 F.2d 242. There, under consideration was a district court rule which was construed by the panel to foreclose such things as a statement by the defense lawyer questioning the constitutionality of the statute under which his client was charged.[17] We find no such restraint in Virginia's rule. To the extent that it was held in Bauer, however, that the reasonable likelihood test is constitutionally impermissible in a rule such as Virginia's we simply disagree. For the reasons we have given, the reasonable likelihood test divides the innocuous from the culpable, adds clarity to the rule and makes it more definite in application. We find no requirement in the Constitution of anything else.
 
 IV.
 
 42
 Hirschkop also charges that certain provisions of Rule 7-107 are unconstitutional because of vagueness.
 
 
 43
 Vague rules offend the due process clause because they deny a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." A vague disciplinary rule also " impermissibly delegates basic policy matters to . . . (officials charged with it enforcement) for resolution on an Ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222 (1972). Vague rules that restrict expression also offend the first amendment because they chill freedom of speech. Their uncertain meanings require those persons who are subject to the rule to " 'steer far wider of the unlawful zone,' . . . than if the boundaries of the forbidden areas were clearly marked." Baggett v. Bullitt, 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964).
 
 
 44
 Rule 7-107(D) prohibits a lawyer participating in a criminal trial from making any statements about "other matters that are reasonably likely to interfere with a fair trial."[18] This proscription is so imprecise that it can be a trap for the unwary. It fosters discipline on a subjective basis depending entirely on what statements the disciplinary authority believes reasonably endangers a fair trial. Thus neither the speaker nor the disciplinarian is instructed where to draw the line between what is permissible and what is forbidden. Cf. Winters v. People of the State of New York, 333 U.S. 507, 519, 68 S.Ct. 665, 92 L.Ed. 840 (1948). This provision of the rule resembles the ban on reporting facts " 'strongly implicative' of the accused" which the Supreme Court held to be "too vague and too broad to survive the scrutiny we have given to restraints on First Amendment rights." Nebraska Press Association v. Stuart, 427 U.S. 539, 545, 568, 96 S.Ct. 2791, 2807, 49 L.Ed.2d 683 (1976); Accord, Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 255-56 (7th Cir. 1975).
 
 V.
 Bench Trials
 
 45
 Rule 7-107 also prohibits lawyers' comments about pending criminal bench trials. The considerations that led us to conclude that a properly drawn rule could constitutionally limit comments about pending criminal jury trials do not apply to cases tried by a court without a jury. Application of such a rule would be appropriate during the investigation, grand jury, arraignment, and other pretrial proceedings. But when it becomes apparent that the case is to be tried by a judge alone, we see no compelling reason for restricting lawyers' comments in order to assure a fair trial. Pretrial publicity has not been shown to be a source of interference to fair bench trials. Cases which have been reversed because of such publicity have invariably been tried by juries. See, e. g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).
 
 
 46
 Judges necessarily must consider evidence that has no direct bearing on the guilt or innocence of the accused. They must determine whether to suppress confessions and other evidence. When this evidence is excluded, they must nevertheless adjudge the accused to be guilty or innocent without considering the evidence which they have heard and held to be inadmissible. This record does not disclose what comments a lawyer could make about a pending case that would be more prejudicial than the information a judge must consider as he separates the wheat from the chaff during the course of an ordinary bench trial.
 
 
 47
 It is unlikely that lawyers' comments could threaten the fairness of a bench trial, and this record does not indicate that they have. Moreover, we cannot assume that such comments would influence a judge to make unfair rulings against either the accused or the state. The suggestion that such an inference could be drawn from publicity highly critical of a judge was rejected in Pennekamp v. Florida, 328 U.S. 331, 349, 66 S.Ct. 1029, 1038, 90 L.Ed. 1295 (1946), where the Court said: "In this case too many fine-drawn assumptions against the independence of judicial action must be made to call such a possibility a clear and present danger to justice."
 
 
 48
 Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) does not require a different conclusion. In Cox the Court sustained the validity of a statute that punished picketing or parading in or near a courthouse "with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge . . . ." In reaching its conclusion, the Court emphasized that it was not dealing with free speech alone but with "expression mixed with particular conduct" picketing and parading. In contrast to the statute under consideration in Cox, Rule 7-107 prohibits pure speech alone. Consequently, Cox is not persuasive authority for applying this rule to bench trials.
 
 
 49
 It is not enough that the rule is rationally related to fair bench trials. The gain in such trials must outweigh the loss of first amendment rights. See Elrod v. Burns, 427 U.S. 347, 362, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Here the evidence discloses that the gain to fair bench trials is minimal, and the restriction on first amendment rights is substantial. We therefore conclude that with respect to bench trials the rule is unnecessarily broad. Since it does not satisfy the second part of the test prescribed by Martinez, 416 U.S. at 413, 94 S.Ct. 1800, its inclusion of bench trials is unconstitutional. But see Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 256-57 (7th Cir. 1975).
 
 VI.
 Sentencing
 
 50
 Rule 7-107(E) prohibits statements that are "reasonably likely to affect the imposition of sentence." In Virginia, when a case is tried by a jury, it is the jury's function to determine not only guilt or innocence but also to impose the sentence. Virginia Code § 19.2-295 (1975). When this procedure is followed, our ruling is Part III about criminal jury trials in general is applicable.
 
 
 51
 When a judge, instead of a jury, imposes sentence, the limitations upon a lawyer's comments are unconstitutional for the reasons that we expressed in Part V dealing with bench trials in general. Indeed, when a judge sentences a prisoner he "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." United States v. Tucker, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). See also Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). In view of this broad discretion granted to a sentencing judge, we see no compelling reason for a rule that prohibits lawyers from commenting about all cases pending sentencing. The rule does not satisfy the second part of the Martinez test, 416 U.S. at 413, 94 S.Ct. 1800. Cf. Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 257 (7th Cir. 1975).
 
 
 52
 Additionally, the broad proscription of statements that are " reasonably likely to affect the imposition of sentence" is void for vagueness for the reasons stated in Part IV at note 18.
 
 VII.
 Disciplinary Proceedings
 
 53
 Rule 7-107(F) applies its prohibitions to professional and juvenile disciplinary proceedings. Since professional disciplinary proceedings are not usually tried by juries, we conclude that this provision of the rule is unnecessarily broad for the reasons stated in Part V dealing with bench trials.
 
 
 54
 When a juvenile may be tried by a jury, our observations about the constitutionality of the rule expressed in Part III are applicable. However, when it becomes apparent that the juvenile is to be tried by a judge, we find no justification for limiting lawyers' comments to insure fairness of the trial for the reasons that we expressed about bench trials in Part V.
 
 
 55
 Parenthetically, we note that Rule 7-107(F) was drafted only to insure the fairness of these proceedings. Other interests of privacy and confidentiality are the subject of different regulations which are not presently before us. See Virginia Code § 16.1-229, Et seq. (1975) (juvenile proceedings); Va. Supreme Court Rules, Part VI, Art. IV, R 13J(5), 216 Va. 941, 1159 (1976) (professional disciplinary proceedings).
 
 VIII.
 Civil Actions
 
 56
 Rule 7-107(G) prohibits a lawyer associated with a civil action from making a broad range of comments during the investigation or litigation of the case. We find this part of the rule to be unconstitutional because it is overbroad.
 
 
 57
 Our system of justice properly requires that civil litigants be assured the right to a fair trial. "The very purpose of a court system is to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures." Cox v. Louisiana,379 U.S. 559, 583, 85 S.Ct. 476, 471, 13 L.Ed.2d 487 (1965) (Black, J., dissenting). Nevertheless, many significant differences between criminal jury trials and civil cases must be considered in evaluating the constitutionality of a general rule limiting lawyers' speech concerning civil cases. Civil litigation is often more protracted than criminal prosecution because of broader civil discovery rules, the complexity of many civil controversies, and the priority given criminal cases. Thus, it is not unlikely that the rule could prohibit comment over a period of several years from the time investigation begins until the appellate proceedings are completed.
 
 
 58
 Civil actions may also involve questions of public concern such as the safety of a particular stretch of highway, the need of the government to exercise its power of eminent domain, or the means of racially integrating schools and colleges. The lawyers involved in such cases can often enlighten public debate. It is no answer to say that the comments can be made after the case is concluded, for it is well established that the first amendment protects not only the content of speech but also its timeliness. Bridges v. California, 314 U.S. 252, 268, 62 S.Ct. 190, 86 L.Ed. 192 (1941).
 
 
 59
 The American Bar Association committee and the Judicial Conference of the United States did not make recommendations concerning civil actions, and this record contains no empirical data that restrictions on lawyers' speech are needed to protect the fairness of civil trials. Sheppard and the other prejudicial publicity cases involved criminal proceedings. No decision reversing the judgment in a civil action because of prejudicial publicity has been called to our attention; indeed, the principal case imposing a gag on lawyers during a civil trial was reversed because the order infringed the first amendment. CBS, Inc. v. Young, 522 F.2d 234 (6th Cir. 1975). Means narrower than Rule 7-107 are available to assure confidentiality in proper cases. Orders protecting trade secrets, other confidential information, and the privacy of individuals are not unusual.
 
 
 60
 The dearth of evidence that lawyers' comments taint civil trials and the courts' ability to protect confidential information establish that the rule's restrictions on freedom of speech are not essential to fair civil trials. We therefore conclude that this provision of the rule is invalid because it is overbroad. Martinez, 416 U.S. at 413, 94 S.Ct. 1800 (1974). Accord, Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 257-59 (7th Cir. 1975).
 
 
 61
 We also conclude that 7-107(G)(5) prohibiting statements about "(a)ny other matter reasonably likely to interfere with the fair trial of the action" is void for vagueness for the reasons stated in Part IV at note 17. Accord, Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 259 (7th Cir. 1975).
 
 IX.
 Administrative Agencies
 
 62
 Rule 7-107(H) limits lawyers' speech concerning matters pending before administrative agencies. Again the record is devoid of any factual basis supporting the need for this provision. Like civil litigation, administrative proceedings often involve subjects of public concern. The record fails to disclose that any administrative decision has been set aside because the comments of lawyers impaired the fairness of the proceedings. The rule, however, would chill discussion by lawyers involved in these public proceedings, for it bars comments about evidence, the results of any examinations or tests, and other matters reasonably likely to interfere with a fair hearing.
 
 
 63
 The state has not proved that the limitations on first amendment rights found in Rule 7-107 are essential to insure the fairness of administrative hearings. Therefore, we conclude that the part of the rule dealing with administrative hearings fails to satisfy the second part of the Martinez test, 416 U.S. at 413, 94 S.Ct. 1800. It, too, must be declared unconstitutional because it is overbroad. Also, the proscription of 7-107(H)(5) against statements relating to "(a)ny other matter reasonably likely to interfere with a fair hearing" is unconstitutionally vague for the reasons stated in Part IV at note 17.
 
 
 64
 The judgment of the district court is affirmed in part and reversed in part, and this case is remanded for the entry of a declaratory judgment that Rule 7-107 is not unconstitutional, insofar as it applies to criminal jury trials, but that otherwise it may not be constitutionally enforced.
 
 
 65
 AFFIRMED IN PART, REVERSED IN PART.
 
 APPENDIX
 
 66
 DR 7-107 Trial Publicity.
 
 
 67
 (A) A lawyer participating in or associated with the investigation of a criminal matter shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that does more than state without elaboration:
 
 
 68
 (1) Information contained in a public record.
 
 
 69
 (2) That the investigation is in progress.
 
 
 70
 (3) The general scope of the investigation including a description of the offense and, if permitted by law, the identity of the victim.
 
 
 71
 (4) A request for assistance in apprehending a suspect or assistance in other matters and the information necessary thereto.
 
 
 72
 (5) A warning to the public of any dangers.
 
 
 73
 (B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:
 
 
 74
 (1) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused.
 
 
 75
 (2) The possibility of a plea of guilty to the offense charged or to a lesser offense.
 
 
 76
 (3) The existence or contents of any confession, admission, or statement given by the accused or his refusal or failure to make a statement.
 
 
 77
 (4) The performance or results of any examinations or tests or the refusal or failure of the accused to submit to examinations or tests.
 
 
 78
 (5) The identity, testimony, or credibility of a prospective witness.
 
 
 79
 (6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case.
 
 
 80
 (C) DR 7-107(B) does not preclude a lawyer during such period from announcing:(1) The name, age, residence, occupation, and family status of the accused.
 
 
 81
 (2) If the accused has not been apprehended, any information necessary to aid in his apprehension or to warn the public of any dangers he may present.
 
 
 82
 (3) A request for assistance in obtaining evidence.
 
 
 83
 (4) The identity of the victim of the crime.
 
 
 84
 (5) The fact, time, and place of arrest, resistance, pursuit, and use of weapons.
 
 
 85
 (6) The identity of investigating and arresting officers or agencies and the length of the investigation.
 
 
 86
 (7) At the time of seizure, a description of the physical evidence seized, other than a confession, admission, or statement.
 
 
 87
 (8) The nature, substance, or text of the charge.
 
 
 88
 (9) Quotations from or references to public records of the court in the case.
 
 
 89
 (10) The scheduling or result of any step in the judicial proceedings.
 
 
 90
 (11) That the accused denies the charges made against him.
 
 
 91
 (D) During the selection of a jury or the trial of a criminal matter, a lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial, except that he may quote from or refer without comment to public records of the court in the case.
 
 
 92
 (E) After the completion of a trial or disposition without trial of a criminal matter and prior to the imposition of sentence, a lawyer or law firm associated with the prosecution or defense shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by public communication and that is reasonably likely to affect the imposition of sentence.
 
 
 93
 (F) The foregoing provisions of DR 7-107 also apply to professional disciplinary proceedings and juvenile disciplinary proceedings when pertinent and consistent with other law applicable to such proceedings.
 
 
 94
 (G) A lawyer or law firm associated with a civil action shall not during its investigation or litigation make or participate in making an extrajudicial statement, other than a quotation from or reference to public records, that a reasonable person would expect to be disseminated by means of public communication and that relates to:
 
 
 95
 (1) Evidence regarding the occurrence or transaction involved.
 
 
 96
 (2) The character, credibility, or criminal record of a party, witness, or prospective witness.
 
 
 97
 (3) The performance or results of any examinations or tests or the refusal or failure of a party to submit to such.
 
 
 98
 (4) His opinion as to the merits of the claims or defenses of a party, except as required by law or administrative rule.
 
 
 99
 (5) Any other matter reasonably likely to interfere with a fair trial of the action.
 
 
 100
 (H) During the pendency of an administrative proceeding, a lawyer or law firm associated therewith shall not make or participate in making a statement, other than a quotation from or reference to public records, that a reasonable person would expect to be disseminated by means of public communication if it is made outside the official course of the proceeding and relates to:(1) Evidence regarding the occurrence or transaction involved.
 
 
 101
 (2) The character, credibility, or criminal record of a party, witness, or prospective witness.
 
 
 102
 (3) Physical evidence or the performance or results of any examinations or tests or the refusal or failure of a party to submit to such.
 
 
 103
 (4) His opinion as to the merits of the claims, defenses, or positions of an interested person.
 
 
 104
 (5) Any other matter reasonably likely to interfere with a fair hearing.
 
 
 105
 (I) The foregoing provisions of DR 7-107 do not preclude a lawyer from replying to charges of misconduct publicly made against him or from participating in the proceedings of legislative, administrative, or other investigative bodies.
 
 
 106
 (J) A lawyer shall exercise reasonable care to prevent his employees and associates from making an extrajudicial statement that he would be prohibited from making under DR 7-107.
 
 PHILLIPS, Circuit Judge, concurring:
 
 107
 I concur in the result reached in the Court's opinion and in the reasoning by which it was reached. I would add to it one consideration that buttresses the reasoning and the result for me and that could be important in my assessment of comparable disciplinary rules in any future cases.
 
 
 108
 The Court's opinion essentially defines the nature of the State's interest vis-a-vis First Amendment rights of lawyers in terms of "fair-trials" to litigants. This may result from the fact that the judicial gag order cases and the prejudicial publicity cases have necessarily emphasized the clash of criminal defendants' fair trial rights against First Amendment rights of the press. From this has arisen the catch characterization, "free press/fair trial," as if it captured the entire problem. Picking it up in this different context it is tempting to view this problem also as one essentially involving simply the lengths to which the state may go in protecting litigants' rights to "fair trial" against lawyers' rights to "free speech." So in the Court's opinion at page 363, in subjecting Rule 7-107 to the first of the two-step Martinez test, the necessary substantial state interest is said to be that of "assuring every person the right to a fair trial."[1] While in other portions of the opinion a wider interest in the judicial process itself is from time to time mentioned, the "fair trial for individual litigant" focus dominates. I agree that safeguarding personal rights to fair adjudications lies at the heart of the state's interest here, but I would define the interest in broader terms that include but are not limited to this.
 
 
 109
 The state has an interest independent of individuals' fair trial rights in protecting the integrity of certain essential judicial processes that are critical in the adversary system.[2] While our judicial systems exist primarily to provide just adjudications of specific disputes between specific litigants, they also have another function precedential and preventive in nature in which the interests of particular litigants, hence of individual "fair trials," are actually subordinate. Legal philosophers are likely to treat these as having generally equivalent value. Furthermore, the state has an interest in protecting the integrity of its judicial processes for the benefit of litigants to come as well as those of the moment, thus an interest simply in their survival for that purpose in their essential, tested forms.
 
 
 110
 The integrity of these processes thus has an ongoing importance to the state that transcends the state's rightful concern for the specific personal rights of individual litigants in pending litigation, and this justifies protection of the processes on broader grounds. Central to those processes, and critical to their continuation in the form we have come to rely upon, is their adversarial nature. The most critical characteristic of the adversarial (as opposed to inquisitorial) system of litigation is the degree to which it gives over to parties acting through counsel a substantial degree of control over the litigation process. This control extends both to the formulation of the legal and factual issues to be laid before the court and to the presentation of factual proof and legal contentions on these issues to the decision maker. See generally F. James & G. Hazard, Civil Procedure § 1.2 (2d ed. 1977).
 
 
 111
 We have come to this mode of adjudication by a centuries long, laborious process that began with the abandonment of compurgation, trial by ordeal and battle, and the use of witness-jurors, and that has sought ever since to insulate the adjudication process from all vestiges of magic, religion, raw physical coercion, and public or political pressure. The result, hardly won, is a litigation process which, though largely under party hence counsel control, is tightly structured to confine decision making to the facts and law formally before the decision-maker. Because such a system relies deliberately on highly partisan advocacy by counsel, both in shaping and moving litigation along, it is especially vulnerable to the natural human tendency of counsel to enlist extraneous influences in behalf of their causes and to take the structured battle of the litigation process "into the streets," or into the public forum afforded by the free press. We need have no compunction in recognizing that in contemporary political philosophy there is a view that justice may indeed sometimes require doing so that deliberate "politicizing" of the legal process may be warranted when needed to obtain justice.[3] This view could, of course, in this free society ultimately prevail by regular political processes or, indeed, outside these. That may come in time, but none can deny that if and when it does, there will have occurred not a simple alteration, but a complete redesign of the legal process as we have known and relied upon it within our judicial branches of government. Until this occurs through regular or other processes, the state has a rightful interest in protecting its judicial system and these formal litigation processes against the threat of incremental, episodic alterations leading toward this end.
 
 
 112
 To define the interest in terms broader than fair trial protection does more than merely satisfy a sense of jurisprudential tidiness. It puts the "imminence of danger/likelihood of prejudice" inquiry in a completely different light than that obtaining when the inquiry is focused narrowly on particular litigants' rights to fair trials. When the system and its vital adversarial processes are seen as objects directly threatened by unbridled "speech" by counsel, the threat is constant, not episodic, and is more readily apparent. For even though particular speech by counsel might turn out to have posed no actual threat to the "fairness" of a particular trial, there may nevertheless have been actual harm, however, subtle, to the integrity of the adversarial process.[4] To this extent the problems of speculativeness dealt with on page 376 of the Court's opinion are not encountered at this level of analysis.
 
 
 113
 To define the interest in these broader terms that include but are not limited to ensuring fair trial for specific litigants does not lead me to a different conclusion than that reached in the Court's opinion. It simply makes the conclusion more compelling. For not only the individual rights to "fair trials," but the party-control characteristic of the adversary system hence the vulnerability of its distinctive judicial processes are at their height in jury trials of both civil and criminal actions. In these the special susceptibility of the lay decision-making group to outside influences is the dominant factor shaping evidentiary and procedural rules. From these plenary actions the dominance of the adversarial characteristics diminishes as one moves across the spectrum of the other judicial proceedings in our system: from bench trials, either criminal or civil, to various administrative and juvenile proceedings. So the state's interest in protecting the legal process apart from personal rights of litigants also peaks in the jury trial. In the Criminal jury trial, there is accordingly combined the highest degree of rightful concern for integrity of process with the highest degree of concern for personal rights of the individual litigants of the moment. Indeed there is combined here both a state interest in protecting those rights And the constitutional guarantees directly undergirding the personal rights of criminal defendants. These in combination suffice for me to justify the specific restraints on speech here upheld by the Court.
 
 
 114
 On this analysis, it is a near thing with me whether these disciplinary rules might not also be sustained as they apply to Civil jury trials. In these the process concerns appear to me generally the same, and on this basis the dividing line would be Jury trial, not Criminal jury trial. Much of what Judge Widener has said in his dissenting and concurring opinion about the indistinguishability of the two makes sense to me. Unlike him, however, I do read the civil action prohibitions in Section (G) to be somewhat more broadly stated, hence more vaguely proscriptive, than the corresponding criminal action prohibitions in Sections (B) and (C). Furthermore, the state's added interest in giving affirmative protection to criminal defendants' constitutional "fair trial" rights seems to me critical in drawing the line where the Court does. I would not, however, rule out the possibility that more narrowly drawn civil jury trial prohibitions might pass muster when weighed in light of the state's interest in the integrity of the process itself on top of the "fair trial" rights of individual civil litigants.
 
 
 115
 For reasons stated in the Court's opinion and those added here, I concur in the result.
 
 
 116
 WINTER and BUTZNER, Circuit Judges, concurring in part and dissenting in part:
 
 
 117
 We concur in parts I, II, IV, V, VI, VII, VIII, and IX of the court's opinion except to the extent that they incorporate the standard approved in part III. We dissent from the court's approval in part III of restrictions on lawyers' comments that do not pose a clear and present danger to the fairness of a criminal trial. Accordingly, we join in the portion of the judgment reversing the district court and dissent from the portion that affirms it. We would remand the case for entry of a declaratory judgment that all of rule 7-107 is unconstitutional.
 
 
 118
 We agree that the state may adopt a rule restricting lawyers' statements about pending criminal cases, but we believe that the first amendment requires such a rule to pass a more rigorous test than that applied by the court to rule 7-107. To be constitutional, a disciplinary rule must limit its restraints on speech to statements that pose a clear and present danger to the fairness of a criminal trial. Rule 7-107 does not satisfy that test.
 
 
 119
 Although Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), approved the use of rules to regulate lawyers' comments about criminal cases tried before a jury, neither it nor succeeding cases decided what degree of regulation would be compatible with the first amendment. Other pertinent authority, however, provides the appropriate standard.
 
 
 120
 In Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), the leading case resolving the conflict between the first amendment and another important governmental interest, Mr. Justice Holmes wrote:
 
 
 121
 The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.
 
 
 122
 Subsequent cases recognized that Mr. Justice Holmes's standard was not a test that provided a ready answer to every situation; determination of what danger is clear and when it is present cannot be ascertained by a simple formula. See Whitney v. California, 274 U.S. 357, 374, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis and Holmes, JJ., concurring). Nevertheless, the Court has accepted the "clear and present danger" phrase as a working principle to protect freedom of speech by requiring proof that "the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." Bridges v. California, 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941). It has equated the clear and present danger test with language that connotes a real and substantial threat to the fairness of a trial. See Pennekamp v. Florida, 328 U.S. 331, 336, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946). The Court has not tolerated a lesser standard for the imposition of restrictions on speech about pending litigation. Craig v. Harney, 331 U.S. 367, 371-72, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).
 
 
 123
 Counsel for the appellees suggests, however, that the difference between the "reasonable likelihood" and the "clear and present danger" standards involves nothing more "than a futile exercise in semantics." This notion is refuted by Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). In Bridges, a newspaper and a labor leader had been convicted of contempt for publishing comments about pending litigation which the trial and appellate courts described as having an "inherent" or "reasonable tendency" to interfere with the fair and orderly administration of justice. The state defended the convictions on the ground that "in so far as these punishments constitute a restriction on liberty of expression, the public interest in that liberty was properly subordinated to the public interest in judicial impartiality and decorum." See 314 U.S. at 259, 62 S.Ct. 190. The Supreme Court unequivocally rejected this argument, holding: "In accordance with what we have said on the 'clear and present danger' cases, neither 'inherent tendency' nor 'reasonable tendency' is enough to justify a restriction of free expression." 314 U.S. at 273, 62 S.Ct. at 198.
 
 
 124
 Bridges also disposes of the contention pressed by appellees' counsel that a standard less rigorous than the clear and present danger test is permissible for temporary restrictions on speech that are limited to the pendency of the trial. Responding to a similar argument, the Court pointed out that the restrictions on speech pending a trial operated when public interest was high. These "moratoria on public discussion," the Court held, cannot "be dismissed as an insignificant abridgment of freedom of expression." 314 U.S. at 269, 62 S.Ct. at 197.
 
 
 125
 Appellees' counsel insists that the reasonable likelihood test has been approved by Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), where the Court said:
 
 
 126
 But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates or transfer it to another county not so permeated with publicity. . . . If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered.
 
 
 127
 This admonition, however, refers to remedial action by trial judges in individual cases. The Court did not explicitly tie the reasonable likelihood standard to a general rule limiting lawyers' comments in all cases. Because the Court was not adjudicating the constitutionality of such a rule, it had no occasion to consider the serious first amendment issues involved. For this reason it is unlikely that the Court implicitly approved a shift from the clear and present danger standard, which it had adopted in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919), to a reasonable likelihood standard, which it had rejected in Bridges v. California, 314 U.S. 252, 273, 62 S.Ct. 190, 86 L.Ed. 192 (1941), without even commenting on the subject. Indeed, Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 845, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), recently affirmed the validity of Bridges and succeeding cases that relied on the clear and present danger standard.
 
 
 128
 Moreover, Sheppard's reasonable likelihood standard for measuring whether publicity has denied a defendant due process cannot be readily adapted to draw the boundaries of lawyers' first amendment rights. The difficulty arises from attempting to restrict first amendment rights prospectively by using a standard that was formulated for retrospectively gauging infringements of the due process clause. When a court applies the reasonable likelihood test to determine whether due process requires that an accused be granted a continuance, change of venue, or new trial because of prejudicial publicity, it views the evidence retrospectively. Thus, it may find that publicity, which may have created a reasonable likelihood of an unfair trial at the time it was published, has been so blunted by the passage of time that it can no longer be considered prejudicial when the case is eventually tried. See, e. g., Beck v. Washington, 369 U.S. 541, 556, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); Wansley v. Slayton, 487 F.2d 90 (4th Cir. 1973). Also, examination of the jurors may disclose that an impartial jury can be selected even though some of them have been exposed to prejudicial publicity. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Viewed retrospectively, not every prejudicial comment invariably requires a change of venue or reversal on the ground that the accused has been denied due process.
 
 
 129
 In contrast, rule 7-107 operates prospectively to prohibit lawyers' comments. When a lawyer speaks about a pending case, he frequently does not know how the case will develop, how his remarks will be interpreted and reported, how much community interest will arise, or what steps the trial judge will take to avoid prejudice. Therefore, a lawyer can only speculate whether his comments might later be judged to have created a reasonable likelihood of prejudice because of contingencies that he might not foresee. Under these circumstances, the prudent course is to avoid all comment, no matter how remote the chance of prejudice might seem at the time. The evidence in this case indicates that this is the rule's present effect. Threatened with professional disgrace, lawyers must restrict their speech "to that which is unquestionably safe." This sweeping proscription offends the first amendment. "Free speech may not be so inhibited." Baggett v. Bullitt, 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964).
 
 
 130
 Although lawyers are officers of the court, the privilege of practicing their profession does not justify the imposition of conditions on their first amendment rights. "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963); Elrod v. Burns, 427 U.S. 347, 360-63, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Lawyers' status, their access to information about pending litigation, and the interest their comments arouse are a part of the environment in which they speak. Consequently, these factors must be considered when determining whether their comments about pending cases constitute a clear and present danger to fair trials. Cf. Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). But their profession, unique as it may be, does not justify measuring their first amendment rights of freedom of speech by standards less protective than those accorded other persons. Cf. Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).
 
 
 131
 Recognizing that "the reasonable likelihood test is too relaxed to provide full protection to the first amendment interests of attorneys," the American Bar Association recently revised the 1968 standard that served as a prototype for Virginia's rule. See ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press 3 (1978). On August 9, 1978, the Association's House of Delegates approved a substantial modification of ABA Criminal Justice Standard 1.1 (1968). The new standard jettisons the former reasonable likelihood test and proscribes only a lawyer's dissemination of information that "would pose a clear and present danger to the fairness of the trial." ABA Criminal Justice Standard 8-1.1(a) (1978).
 
 
 132
 In sum, we conclude that the governmental interest in fair jury trials of criminal cases and the lack of less restrictive means for achieving this end justify the promulgation of a rule restricting the comments that a lawyer may make for publication. Procunier v. Martinez, 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Such a rule, however, can prohibit only the types of statements that pose a clear and present danger or a real and substantial threat to fair trials. Pennekamp v. Florida, 328 U.S. 331, 336, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); Bridges v. California, 314 U.S. 252, 273, 62 S.Ct. 190, 86 L.Ed. 192 (1941); Baggett v. Bullitt, 377 U.S. 360, 373, 84 S.Ct. 1316, 12 L.Ed.2d 37 (1964). Rule 7-107 does not meet these constitutional requirements. Accord Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 249-51 (7th Cir. 1975); ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press 1-5 (1978). We therefore respectfully dissent from the court's approval of a disciplinary rule based on a less stringent standard.
 
 
 133
 WIDENER, Circuit Judge, concurring and dissenting:
 
 
 134
 I concur in the result reached in the preamble to the numbered parts of the opinion and in parts I, II, III, and IV thereof, as well as in the opinion of the court as to them. I concur in the result in parts V, VII, and IX of the opinion of the court.
 
 
 135
 As to part VIII, I concur in the result as to civil actions tried to a judge, but where part VIII invalidates Rule G as it applies to civil actions tried to a jury, I respectfully dissent. As to part VI of the opinion, I concur and dissent as I will explain below.
 
 
 136
 * In this case, we are faced with a conflict between the First Amendment right of free speech and the important but more generally stated constitutional right of a fair trial, which is, in the factual setting before us, the preservation of the integrity of the judicial process. I think the court arrives at the correct rule when it reasons that a court may restrict the utterances of a participating attorney if there is reasonable likelihood that such utterances will impair the integrity of the trial with the qualification that the limitation on the utterances must be no greater than is necessary or essential to protect that governmental interest.
 
 II
 
 137
 (Civil trials, Part VIII of the opinion of the court)
 
 
 138
 Upon reading the opinion of the court, it is at once apparent that the key to the holding that the participating attorneys' speech may in some wise be restricted is the distinguishing fact that the particular criminal case is tried to a jury. No other point is made I consider of distinguishing validity, and I suggest there is none. It is the chance, then, that the utterances of the attorneys may have an influence on the jury that we hold may be proscribed in order to protect the integrity of the trial.
 
 
 139
 But civil jury trials, like criminal, also deserve to be protected. I do not think it correct to rule, as we do, that an attorney participating in a civil trial may disrupt that proceeding under the guise or excuse of free speech. If he does, I think he should be subject to the contempt power of the court.
 
 
 140
 While the opinion distinguishes the criminal from the civil jury trial for the reasons that civil litigation is often more protracted, that the attorneys involved in such cases can often enlighten public debate, and that the record contains no empirical data that restrictions on attorneys' speech are needed to protect the fairness of a civil trial, I suggest these reasons do not withstand critical analysis. That civil litigation is often more protracted than criminal prosecution does not mean there are not many long and drawn out criminal trials, and the fact that many civil trials are longer should not suffice as a reason to deny protection to all of them. If the attorneys involved in civil cases can enlighten public debate, it must be said that the same applies with greater emphasis in criminal cases. And if there is public need in either case for the attorneys to speak out, there is more need in the criminal case, where the state may impose its ultimate sanction of deprivation of life or liberty, than in the civil case, where the usual sanction is deprivation of property. I count for little or nothing the fact that the record contains no empirical data with respect to restrictions on attorneys' speech in the context of civil trials. As we have held, the rule complained of is a legislative finding, making empirical data unnecessary. I suggest lack of empirical data is not a sufficient reason on which to base constitutional invalidity when a legislative finding is at hand. Also, civil juries are generally drawn from the same source as criminal juries; in Virginia, the source is precisely the same. See Va.Code §§ 8.01-345; 19.2-260. It follows that no empirical data is needed to show that if a criminal jury may be influenced a civil jury must similarly be, for they are the same men and women.
 
 
 141
 Because the court invalidates the rule with respect to all civil cases, whether tried to a judge or to a jury, for the same reason, because "it is over broad," I can only assume the court by "over broad" means doing more than is required to protect the essential fairness of the proceeding. The court cannot mean over breadth as used on p. 371 of the opinion quoting from Nebraska Press Association, because the court describes the "clarity" of specific prohibitions as "avoiding problems of vagueness." p. 368. Since precisely the same things have to be done to protect civil and criminal jury trials, I do not think this reason will suffice as a reason for invalidity.
 
 
 142
 Therefore, I think the analysis which must have been made with respect to civil cases is that the value of the public interest in protecting the integrity of a criminal trial is greater than the value of the public interest in protecting the integrity of a civil trial, and that the court has adjudged that the right of the attorney to exercise free speech is greater than the value of protecting the integrity of a civil jury trial, even to the point of its disruption, while the same is not true in the similar criminal proceeding because of the greater public interest in protecting its integrity.
 
 
 143
 I cannot agree. I think that such rights of free speech which an attorney forfeits when he undertakes to submit himself to the discipline of the court in the practice of law must also include making public statements about a case if there is a reasonable likelihood such statements will impair the fundamental integrity of the trial in which he is participating. I think this particularly includes civil trials to a jury.
 
 
 144
 With respect to that part of part VIII which invalidates Rule G, parts (1), (2), (3), and (4), I would point out that Rule G(1) is the same as or similar to Rules B(3) and B(5); Rule G(2) is the same as or similar to B(1); Rule G(3) is the same as or similar to Rule B(4); and Rule G(4) is the same as or similar to Rule B(6). I concur in the result as to the invalidation of the rule as to civil cases tried to a judge, not for the reason given by the court but because I do not think there is a reasonable likelihood that the exercise of free speech by an attorney in such cases would impair the integrity of the trial. There being no such reasonable likelihood, the restriction on free speech should be invalidated. To me it seems arguably inconsistent to invalidate a rule, specific in terms, for over breadth, when the same or a similar rule has been previously upheld in the opinion in which a finding has been made that the integrity of trials is a governmental interest worthy of protection. The protection afforded the trial is essentially the same under Rule G (civil) and Rule B (criminal). The difference is that the criminal jury trial needs protection, while the civil trial to a judge does not. The reason to invalidate the regulation, therefore, should be, it seems to me, that there is no reasonable likelihood of impairing the integrity of the trial, not that the regulation does more than do so.
 
 III
 
 145
 (Sentencing, Part VI of the opinion of the court)
 
 
 146
 Rule E prohibits statements that are "reasonably likely to affect the imposition of a sentence."
 
 
 147
 The rule reads in terms that it does not come into effect until "after the completion of a trial or disposition without trial of a criminal matter and prior to the imposition of sentence." Therefore, it would have no application until after a jury verdict in a trial by jury, or a finding of guilty following a plea of guilty or nolo contendere, or a finding of guilty in a trial to a judge, all of which are prior to the imposition of sentence. If the rule in terms is to be followed, and I see no reason to construe it other than literally, then I do not think part III of the opinion has any application in the case to make Rule G effective in criminal jury trials because, as the rule states, it does not apply until after a jury verdict or a finding of guilt by a judge.
 
 
 148
 Assuming its applicability, however, in some instances, as the opinion of the court does, then it seems to me that if the rule is invalid on account of vagueness, as the opinion holds, it should simply be set aside as was Rule D, although Rule D admittedly applies to criminal trials to a jury. If Rule D is so imprecise that it can be a trap for the unwary, then Rule E must be. I would simply invalidate Rule E in all cases on account of vagueness.
 
 IV
 
 149
 I concur in the result in parts V, VII, and IX of the opinion subject to the same remarks with reference to over breadth I have made in my concurrence in the result in that part of the opinion (VIII) relating to civil trials to a judge.
 
 
 150
 I concur in those parts of the opinion holding Rules D, E, G(5), and H(5) invalid for vagueness.
 
 
 151
 I point out that the rules we set aside in parts V and VII for over breadth are the same we find valid in parts II and III, and the rule we set aside in part IX for over breadth is essentially the same as we have validated in parts II and III.
 
 V
 
 152
 The question of deliberate interference with a trial by the utterances of an attorney participating therein is not before us, and I express no opinion on that matter.
 
 
 
 *
 This case was originally heard before a panel composed of Chief Judge Haynsworth, Judge Winter and Judge Butzner. This opinion is largely extracted from a proposed majority opinion of the panel, prepared by Judge Butzner and a proposed concurring and dissenting opinion, written by Judge Haynsworth. Rehearing En banc was ordered after those opinions had been circulated but before they were filed. Thus, this opinion was written in part by each of two judges
 
 
 [1]
 See Rules of Court, 211 Va. 295, 347-50 (1970). The rule is set forth in the appendix to this opinion
 
 
 [2]
 The first amendment provides in part: "Congress shall make no law . . . abridging the freedom of speech . . . ." It is made applicable to the states by the fourteenth amendment. Near v. Minnesota, 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)
 
 
 [3]
 Hirschkop v. Virginia State Bar, 421 F.Supp. 1137 (E.D.Va.1976)
 
 
 [4]
 The Justices of the Supreme Court of Virginia took no part in the settlement and compromise. They were retained as defendants because in their official capacity they had promulgated the rule on petition of the Virginia State Bar
 
 
 [5]
 Canon 20 read: Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstances of a particular case justify a statement to the public, it is unprofessional to make it anonymously. An ex parte reference to the facts should not go beyond quotation from the records and papers on file in the Court; but even in the extreme cases it is better to avoid any Ex parte statement
 
 
 [6]
 See Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941)
 
 
 [7]
 Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)
 
 
 [8]
 The language of the Court is more nearly directive than suggestive
 
 
 [9]
 For the District Courts of the United States, the Judicial Conference of the United States recommended the adoption of a similar rule. See the report of its Committee on the Operation of the Jury System, of which our late brother Craven was a member. 45 F.R.D. 391, et seq. Another study was made by a Committee of the Association of the Bar of the City of New York chaired by Senior Circuit Judge Medina
 
 
 [10]
 See, e. g., Sheppard v. Maxwell, 384 U.S. 333, 350-52, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Irwin v. Dowd, 366 U.S. 717, 729, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (Frankfurter, J. concurring); Chase v. Robson, 435 F.2d 1059, 1060 (7th Cir. 1970)
 
 
 [11]
 See Irwin v. Dowd, 366 U.S. 717, 730, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (Frankfurter, J. concurring)
 
 
 [12]
 In a jurisdiction in which sentences are fixed by juries, a jury trial may be less unlikely
 
 
 [13]
 Is an "immediate harm" worked by a prosecutor's publication of the fact that a confession has been obtained from one who has a long record of convictions of particularized felonies if later, at the trial, the confession and the criminal record are, both, held to be admissible? The reasonable likelihood test is met by the fact that, at the time of publication, the questions of admissibility are undecided. Whether the present danger and immediate harm tests are met is uncertain. If they are, the present debate may be only a matter of semantics, not a matter of constitutional doctrine
 
 
 [14]
 Whitney v. California, 274 U.S. 357, 374, 47 S.Ct. 641, 71 L.Ed. 1095 (1927)
 
 
 [15]
 Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919)
 
 
 [16]
 Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941)
 
 
 [17]
 The Bauer holding has prompted the American Bar Association to promulgate a new proposed standard regulating the conduct of attorneys in criminal cases. ABA Standards Relating to Fair Trial and Free Press. § 8-1.1 (Tentative Draft 1978)
 
 
 [18]
 Similar restrictions apply to comments about juvenile, disciplinary, and administrative proceedings, and civil actions. Rule 7-107(F), (G)(5), and (H) (5)
 
 
 [1]
 Understandably, the plaintiff would also prefer to have the state's interest identified this narrowly. See Brief for Appellant at 109
 
 
 [2]
 This interest is one quite apart from any associated merely with protecting the "dignity" of the process or of individual judges, or with "regulating the profession." These, I agree, are not particularly weighty interests in the First Amendment balance, and they are not what I have in mind
 
 
 [3]
 Indeed, there is more than a suggestion of this in plaintiff's argument in brief on this appeal. Thus plaintiff contends that restricting lawyers' speech in respect of pending litigation is detrimental to "the open society which is required by a democratic nation and by the individual accused of crime in such a nation." Then follows this quote from Meiklejohn's Political Freedom (1960): "Just so far as, at any point, the citizens who are to decide an issue are denied acquaintance with information or opinion or doubt or disbelief or criticism which is relevant to that issue, just so far the result must be ill-considered, ill-balanced planning for the general good." Brief for Appellant at 106-07. Transposed into the context of lawyer speech about pending litigation, this general paean to the virtues of informed democratic decision-making must have reference to the jury as the decision-makers and to the issues as those of formal litigation
 
 
 [4]
 The harm done to the process on any particular occasion is likely to appear minimal in the broad sweep of time and that process. But it surely is not fanciful to assume an escalating effect if retaliation becomes the order of the day for lawyers freed of the traditional curbs on out-of-court comments about pending litigation. It has to be borne in mind that these curbs have long been in general effect as built-in aspects of the legal system precisely because of these and antecedent disciplinary rules. Rules of this type have been sustained until the present time by a general consensus within the profession as well as by the legal authority now being challenged. We simply do not know on the basis of any substantial prior experience what removing the curbs will do to the process itself. While plaintiff disclaimed on oral argument any contention that lifting the prohibitions was being urged to equalize the out-of-court comment battle between lawyers, this is plainly suggested in his written brief as one of the expected benefits. Brief for Appellant at 96-97; See id. at 84-85. Outside contests for public support between prosecutors and defense counsel, each justifying his participation on necessity, must pose real, not fanciful, threats to the legal process