In re Joseph D. MORRISSEY, Appellant.

No. 98–4168.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 28, 1998.

Decided Feb. 11, 1999.

**ARGUED:** David Bernard Hargett, Morrissey, Hershner & Jacobs, Richmond, Virginia, for Appellant. Andrew Gerald McBride, Assistant United States Attorney, Richmond, Virginia, for Appellee. **ON BRIEF:** J. Paul Gregorio, Morrissey, Hershner & Jacobs, Richmond, Virginia; Everette Garrett Allen, Jr., Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Virginia, for Appellant. Helen F. Fahey, United States Attorney, David J. Novak, Assistant United States Attorney, Richmond, Virginia, for Appellee.

Before ERVIN and HAMILTON, Circuit Judges, and MOON, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge ERVIN wrote the opinion, in which Judge HAMILTON and Judge MOON joined.

## OPINION

ERVIN, Circuit Judge:

Prior to a criminal trial in which he was a participating lawyer, Virginia attorney Joseph D. Morrissey ("Morrissey") made extrajudicial statements to the media regarding the case. Based on these actions, Morrissey was convicted of two counts of criminal contempt for violating Local Criminal Rule 57 ("Local Rule 57") of the United States District Court for the Eastern District of Virginia.

This case presents the question of whether Local Rule 57, which restricts a lawyer's extrajudicial comments about pending litigation, is facially unconstitutional because it

violates an attorney's First Amendment right to free speech. The district court found that Local Rule 57 did not offend the First Amendment and denied Morrissey's motion to dismiss the contempt charges pending against him. Morrissey appeals. For the reasons set out below, we affirm.

## I.

On January 16, 1997, Joel W. Harris ("Harris") was indicted on state drug distribution charges. Immediately following his indictment, Harris hired Morrissey, an experienced trial lawyer and former Commonwealth of Virginia prosecutor, as his attorney. Harris is a long-time Richmond political operative and former mayoral aide. His indictment attracted substantial media attention throughout the area.

Given Harris' political connections, the prosecution was dogged by accusations of partisanship on the part of the Commonwealth[1] officials investigating the case. Eventually this political pressure impeded the investigation and federal authorities took over, moving the case to federal court.

As part of his trial preparation, Morrissey hired investigator James Bates ("Bates") to help him determine the identity of the witnesses who testified against Harris before the state grand jury. Bates identified John Buerkley ("Buerkley") as one of the grand jury witnesses and arranged an interview between Morrissey and Buerkley. During the videotaped interview, Buerkley recanted much of his state grand jury testimony. Neither party disputes the fact that they were aware Buerkley would be called as a government witness during trial.

Two days after this interview, Harris was indicted on federal drug distribution charges. The indictment alleged that Harris had exchanged drugs for sexual favors. These salacious details generated an even greater media frenzy in the geographic area from which jurors for the federal case would be drawn and in which key witnesses lived.

On the same day of Harris' indictment, the Assistant United States Attorney assigned to the case, James B. Comey ("Comey"), sent Morrissey a copy of the indictment and a copy of Local Rule 57. Comey felt the need to remind Morrissey of the applicability of Local Rule 57 because Morrissey had a reputation for aggressive use of the media in high-profile cases, and because comments similar to the ones that Morrissey had previously made during the state proceedings would be prohibited in federal court under this rule.

On the morning of February 11, 1997, John Honey ("Honey"), counsel for another potential witness against Harris, called Morrissey to caution him against approaching Honey's client directly for an interview. In that conversation, Morrissey indicated that he had scheduled a press conference for later that afternoon and planned to show the videotape of Buerkley recanting his grand jury testimony. Morrissey also told Bates and Buerkley's attorney Augustus Hydrick ("Hydrick") about the planned press conference. Both Hydrick and Bates discouraged Morrissey from holding the press conference for fear it would jeopardize their chances to convince any other witnesses to talk to them. Hydrick testified that Morrissey said he needed to do this in order to send a message to the other witnesses. Comey also found out about the press conference and faxed Morrissey a letter that again cited Local Rule 57 and urged him to cancel the press conference.

Morrissey went ahead with the press conference. He made some remarks, presented a press release, and played the videotape of Buerkley's recantation. The press conference received extensive media coverage throughout the Richmond area.

Later that afternoon, Morrissey responded to Comey's letter claiming that he had discussed Local Rule 57 with three former prosecutors and, based on their conversations, decided to hold the press conference. Later, during the show cause hearings, the three attorneys Morrissey spoke with all denied that they had advised him to go forward with the press conference.

---

1. Although Virginia is officially a Commonwealth rather than a state, we will hereafter use the word state in order to draw a clear line between the state and the federal prosecutors.

In further support of his actions, Morrissey insisted that his statements to the media dealt only with the state case and the tainting of witnesses before the state grand jury. At that point, all state charges against Harris had been dismissed and only federal charges remained. According to Bates, Morrissey called the press conference to shake other witnesses, or as Morrissey put it, to induce others to come forward. Instead, these acts rattled several potential witnesses. One even threatened to recant his testimony just to avoid having to testify during trial.

The day after the press conference, the first show cause order was issued against Morrissey by District Court Judge James R. Spencer. The order charged him with willfully violating Local Rule 57 by holding a press conference to discuss information about and the credibility of a prospective government witness in a pending criminal proceeding. At Morrissey's February 19 show cause hearing, the district court judge reminded both parties of Local Rule 57 and promised harsh punishment for future violators.

On March 4, two weeks before the trial, Morrissey again made public statements about the Harris case in an interview with a Richmond newspaper reporter. Morrissey characterized the charges against Harris as vicious and vindictive and questioned whether they ever should have been filed. He went on to remark that if these charges had been filed when he was a prosecutor, they would have been laughed out of court. Based on these comments, a second show cause order was issued against him. Again, Morrissey was charged with willfully violating Local Rule 57 by making comments to a newspaper reporter regarding the merits of Harris' pending case.

Morrissey moved to dismiss the show cause orders, arguing that Local Rule 57 impermissibly infringed upon his right to free speech. On October 27, 1998, the district court denied the motion to dismiss on First Amendment grounds and conducted a bench trial on the charges.

At trial, the district court found that Morrissey knowingly violated Local Rule 57, specifically sections (C)(4) and (C)(6), which prohibit lawyers from making public statements regarding the identity, testimony, or credibility of prospective witnesses; or from giving any opinion as to the merits of a pending case. The court held that Morrissey's actions were reasonably likely to taint the jury pool, to make jury selection more difficult, and to interfere with prospective witnesses. Morrissey was found guilty of two violations of Local Rule 57 and sentenced to ninety days imprisonment and three years probation. Morrissey was also suspended from practicing law in the Eastern District of Virginia for two years. Morrissey appeals the district court's finding that Local Rule 57 does not violate the First Amendment.

II.

We review the district court's legal conclusion that Local Rule 57 is constitutional *de novo*. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1038, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (encouraging the appellate court to review the entire record). In cases raising First Amendment challenges, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that' the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284–86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

Morrissey argues that Local Rule 57[2] is facially unconstitutional because its restric-

---

2. **In relevant part, Local Rule 57 provides:**

(A) *Potential or Imminent Criminal Litigation:* In connection with pending or imminent criminal litigation with which a lawyer or a law firm is associated, it is the duty of that lawyer or firm not to release or authorize the release of information or opinion (1) if a reasonable person would expect such information or opinion to be further disseminated by any means of

public communication, and (2) if there is a reasonable likelihood that such dissemination would interfere with a fair trial or otherwise prejudice the due administration of justice.

\*  \*  \*  \*  \*  \*

(C) *Pending Criminal Proceedings—Specific Topics:* From the time of arrest, issuance of an arrest warrant, or the filing of a complaint,

tions on a lawyer's freedom of speech impermissibly infringe on Morrissey's First Amendment rights as interpreted by the Supreme Court in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). Specifically, Morrissey argues that because the Court in *Gentile* held that the "substantial likelihood" standard was narrowly tailored enough to strike the proper balance between protecting the right to a fair trial and a lawyer's right to freedom of speech, the less protective "reasonable likelihood" standard in Local Rule 57 cannot also be sufficiently narrowly tailored to withstand a constitutional challenge.

We addressed the constitutionality of a rule very similar to Local Rule 57 in *Hirschkop v. Snead*, 594 F.2d 356 (1979), a pre-*Gentile* case. In *Hirschkop*, we found the "reasonable likelihood" standard to be sufficiently narrowly tailored so as not to violate the First Amendment. Morrissey argues that *Gentile* silently overruled *Hirschkop* and thereby rendered the "reasonable likelihood" standard unconstitutional. As a threshold matter, we must determine if *Gentile* silently overruled *Hirschkop*.

### A.

In *Hirschkop*, Virginia attorney Phillip J. Hirschkop filed a declaratory judgment action challenging the constitutionality of a local rule identical to Disciplinary Rule 7–107(b) ("DR 7–107(b)") of the American Bar Association's Code of Professional Responsibility. His challenge was brought on grounds that the rule, which applied the "reasonable likelihood" standard, impermissibly restricted lawyer's speech in violation of the First and Fourteenth Amendments. *Hirschkop*, 594 F.2d at 362. Local Rule 57 is very similar to DR 7–107 in that it enumerates six specific categories of extrajudicial statements that are expressly prohibited during pending criminal trials if they are judged to be reasonably likely to materially prejudice the due administration of justice.

This Court upheld the "reasonable likelihood" standard as constitutional. First, this Court established that the rule furthered the important governmental interest of protecting both the accused's and the public's right to a fair trial. *See id.* at 363–64. Next, this Court turned its attention to whether the rule imposed unnecessarily broad restrictions. *See id.* at 364–70. Since there were six enumerated categories of restricted statements prohibited only if reasonably likely to prejudice the trial, this Court was satisfied that the rule was narrowly drawn and provided attorneys with sufficient notice of what they could and could not publicize. *See id.* at 367–68.

As we acknowledged in *Hirschkop*, the Seventh Circuit previously found the "reasonable likelihood" standard to be unconstitutional, but we explicitly rejected its reasoning and declined to follow its lead. *See id.* at 370 (acknowledging and rejecting the Seventh Circuit's holding in *Chicago Council of*

---

information, or indictment in any criminal matter until the termination of trial or disposition without trial, a lawyer or a law firm associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement which a reasonable person would expect to be further disseminated by any means of public communication, if such statement concerns:

  (1) The prior criminal record (including arrests, indictments, or other charges of crime), or the character or reputation of the accused, except that the lawyer or law firm may make a factual statement of the accused's name, age, residence, occupation, and family status and, if the accused has not been apprehended, a lawyer associated with the prosecution may release any information necessary to aid in his or her apprehension or to warn the public of any dangers such person may present;

  (2) The existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement;

  (3) The performance of any examinations or tests or the accused's refusal or failure to submit to an examination or test;

  (4) The identity, testimony, or credibility of prospective witnesses, except that the lawyer or law firm may announce the identity of the victim if the announcement is not otherwise prohibited by law;

  (5) The possibility of a plea of guilty to the offense charged or a lesser offense;

  (6) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

D. E.D.V. R. 57.

*Lawyers v. Bauer*, 522 F.2d 242(7th Cir. 1975), that the "reasonable likelihood" test is unconstitutional). In our opinion, "the reasonable likelihood test divides the innocuous from the culpable, adds clarity to the rule and makes it more definite in application." *See id.* at 370.

Five years later, we reaffirmed the reasoning in *Hirschkop* when we considered whether an order prohibiting witnesses from making statements to the media about their testimony unconstitutionally infringed upon the witnesses' First Amendment rights. *See In re Russell*, 726 F.2d 1007, 1010-11 (4th Cir.1984). In *Russell*, we applied the "reasonable likelihood" test and held that the order under consideration in that case was unconstitutional. *Id.*

Fourteen years after *Hirschkop*, the Supreme Court considered the constitutionality of a similar disciplinary rule prohibiting lawyer speech that would have a "substantial likelihood of materially prejudicing an adjudicative proceeding." *Gentile*, 501 U.S. at 1062-63, 111 S.Ct. 2720. The Court in *Gentile* emphasized the importance of the governmental interest protected by such rules, stating that "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Id.* at 1075, 111 S.Ct. 2720. Chief Justice Rehnquist, writing for the Court, focused on the high costs to society of extrajudicial statements including the need for new trials, for changes of venue, and for extensive voir dire examination, and found that too often even these expensive and time consuming measures could not cure the damage caused by such careless statements. *See id.*

The Court then examined the "substantial likelihood" standard to determine if it was sufficiently narrowly tailored to avoid infringing on the First Amendment rights of lawyers. The Court found the Nevada rule to be narrow enough because (1) it restricted speech without regard to the point of view expressed in the speech, (2) it applied equally to all attorneys participating in the case, (3) it only postponed the attorney's comments until after the trial, and (4) it only applied to

speech that was substantially likely to have a materially prejudicial effect. *See id.* at 1076, 111 S.Ct. 2720.

Morrissey correctly points out that both the plurality and concurring opinions in *Gentile* agreed that the "substantial likelihood" standard struck a constitutional balance between the right to a fair trial and an attorney's First Amendment rights. *Gentile*, 501 U.S. at 1075, 1082, 111 S.Ct. 2720 (O'Connor, J., concurring). It cannot be said, however, as Morrissey argues, that *Gentile* stands for the proposition that the "substantially likely" standard is the only constitutionally permissible standard for restrictions on lawyer speech under the First Amendment.

In *dicta*, the Court acknowledged the existence of different standards, including the "reasonable likelihood" standard in place in eleven states. *See id.* at 1068, 111 S.Ct. 2720. It did not, however, as Morrissey insists, make any attempt to evaluate the constitutionality of any test other than the "substantially likely" standard as presented in that case. *See id.* Nor is Morrissey's interpretation of *Gentile* supported by the Court's comment in *dicta* that the "reasonable likelihood" standard is "less protective of lawyer speech." *Id.* at 1067, 111 S.Ct. 2720.

The Second Circuit has come to the same conclusion. In *United States v. Cutler*, 58 F.3d 825 (2d Cir.1995), the Second Circuit explicitly followed this Court's reasoning in *Hirschkop* and upheld the constitutionality of a local rule identical to Local Rule 57. *See id.* at 835. That court cited *Gentile* throughout its decision, but never discussed the Supreme Court's mention of the "reasonable likelihood" standard as less protective of lawyer speech, nor did it reason that a rule employing the "reasonable likelihood" standard was unconstitutional. *Id.* at 836-37.

We agree with the Second Circuit's reasoning in *Cutler* and hold that *Gentile* and *Hirschkop* are consistent with one another. We decline to accept Morrissey's argument that we should find that, through its silence, the Supreme Court in *Gentile* overruled our prior holding in *Hirschkop*. Further, we discourage reliance on such a premise, for we believe arguing that a precedent has been

overruled through a court's silence is a disfavored enterprise within this circuit.

## B.

After determining that *Gentile* does not overrule *Hirschkop*, we endeavor to illustrate that the "reasonable likelihood" standard is sufficiently narrowly tailored to pass constitutional muster and was constitutionally applied to Morrissey.

Under the First Amendment, content-based restrictions on attorney speech are permissible only when they are no greater than necessary to protect an accused's right to a fair trial or an impartial jury. *See Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In *Procunier*, the Supreme Court established that for a regulation proscribing lawyer speech to be constitutional, it "must further an important or substantial government interest unrelated to the suppression of expression . . . [and] the limitation on First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* 416 U.S. at 413, 94 S.Ct. 1800.

There is little doubt in this case that the first part of the *Procunier* test is met. Courts have agreed that protecting the right to a fair criminal trial by an impartial jury whose considerations are based solely on record evidence is a compelling state interest. *See Gentile*, 501 U.S. at 1075, 111 S.Ct. 2720; *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Hirschkop v. Snead*, 594 F.2d 356, 363 (4th Cir.1979). Therefore, the real question is whether the restriction applied to lawyer speech in Local Rule 57 is narrowly tailored enough to be no greater than necessary to protect the government interest involved. The restrictions on Morrissey's First Amendment rights as imposed by Local Rule 57 are both narrow and necessary. Local Rule 57 is narrow in that it prohibits only the statements that are likely to threaten the right to a fair trial and an impartial jury. The text of the rule explicitly lists six limited categories of prohibited speech that represent only the statements the Supreme Court

established in *Sheppard* as most likely to cause prejudice in adjudicative proceedings. *See Sheppard*, 384 U.S. at 361–62, 86 S.Ct. 1507.

In addition, *Gentile* states that limitations on lawyer speech must be aimed at the two evils that threaten the integrity of the judicial system. Those evils are (1) comments that will likely influence the outcome of a trial and (2) statements that will prejudice the jury venire even if an untainted jury panel can eventually be found. *See Gentile*, 501 U.S. at 1075, 111 S.Ct. 2720. Morrissey's press conference publicly called into question the credibility of a key witness in Harris' case, an action that would likely influence the outcome of the trial. Further, in his later statements to the reporter he cast doubt on the strength of the government's case and in doing so relied on his expertise as a former prosecutor. These comments went directly to the merits of the case. Both of these actions are precisely the types of behavior that the Court in *Gentile* was concerned about and thought could and should be prohibited.

Finally, *Gentile* states that for a rule restricting lawyer speech to be narrowly tailored it must be neutral as to points of view, apply equally to all attorneys in the case, and only postpone lawyers' comments until after the trial. *Id.* at 1075–76, 111 S.Ct. 2720. Local Rule 57 makes no distinctions based on point of view nor does its prohibition on speech last any longer than the trial. The rule also applies to all lawyers or law firms participating on either side of the pending litigation. Local Rule 57, like the rule evaluated in *Gentile*, satisfies each of the elements required for constitutionally adequate protection and therefore does not impermissibly infringe on a lawyer's First Amendment rights.

## III.

Local Rule 57 is aimed at securing the right to a fair trial by an impartial jury and avoiding conduct that imposes unnecessary costs on the judicial system. The language of the rule accomplishes these objectives by imposing a constitutionally permissible restriction on lawyer

speech. This Court's ruling in *Hirschkop* is controlling in this matter and as such Local Rule 57 is not facially unconstitutional. We affirm the district court's ruling that Local Rule 57 is constitutionally valid on its face and as applied to Morrissey.

*AFFIRMED.*