PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHILD EVANGELISM FELLOWSHIP OF
SOUTH CAROLINA,
                    *Plaintiff-Appellant,*

v.                                              No. 06-1819

ANDERSON SCHOOL DISTRICT FIVE,
                    *Defendant-Appellee.*

Appeal from the United States District Court
for the District of South Carolina, at Anderson.
Henry M. Herlong, Jr., District Judge.
(8:04-cv-01866-HMH)

Argued: October 24, 2006

Decided: December 15, 2006

Before WILKINSON, WILLIAMS, and MICHAEL, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Wilkinson wrote
the opinion, in which Judge Williams and Judge Michael joined.

---

## COUNSEL

**ARGUED:** Mathew D. Staver, LIBERTY COUNSEL, Maitland,
Florida, for Appellant. Kenneth Paul Woodington, DAVIDSON,
MORRISON & LINDEMANN, P.A., Columbia, South Carolina, for
Appellee. **ON BRIEF:** Erik W. Stanley, LIBERTY COUNSEL,
Lynchburg, Virginia; Anita L. Staver, LIBERTY COUNSEL, Mait-
land, Florida; Samuel D. Harms, Greenville, South Carolina, for

Appellant. David L. Morrison, DAVIDSON, MORRISON & LINDE-MANN, P.A., Columbia, South Carolina, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

The Child Evangelism Fellowship of South Carolina ("CEF") challenges policies under which it was denied a fee waiver for religious club meetings that it sought to hold in the facilities of Anderson School District Five. CEF argues that the school district violated the First Amendment by permitting school officials to waive fees "as determined to be in the district's best interest," among other grounds. The district court concluded that this language was vague enough to allow school administrators to violate the First Amendment by treating speakers differently based upon their views, but found no constitutional problem because it concluded that the school district had not engaged in viewpoint discrimination. We reverse, because the unfettered discretion conferred by district policy presents such a risk of viewpoint discrimination as to run afoul of the First Amendment.

I.

Plaintiff Child Evangelism Fellowship of South Carolina is a non-profit religious organization that has unsuccessfully sought free use of school facilities in Anderson County, South Carolina. CEF sponsors after-school moral and religious instruction through "Good News Clubs" for children between the ages of five and twelve. The clubs are non-denominational, free of charge, and open to children regardless of their religious backgrounds or beliefs. Activities include singing hymns, reading stories, memorizing Bible verses, and participating in Bible lessons. CEF holds club meetings at elementary schools in order to avoid the logistical and safety problems associated with transporting young children to off-site locations at the close of the school day.

The defendant, Anderson School District Five, granted CEF's request to hold a Good News Club at Midway Elementary School, but

declined to waive usage fees for CEF under both the policy in effect at the start of this litigation and a revised policy implemented while this case was before the district court. CEF first sought access to the schools when access was governed by "Policy KG." The policy began with a statement of purpose indicating both a desire for broad community access and a desire to recoup costs: "The board of trustees recognizes the capital investment of the community in school property and desires that buildings and other facilities be used to promote the general welfare of the community," but "[c]ommunity use of school facilities cannot be subsidized with district funds."

Policy KG authorized use of school facilities by formally constituted nonprofit community groups, governmental entities, and for-profit enterprises providing activities not offered by the school but "considered a desired part of the school curriculum." The policy stated that the district would implement a fee schedule "sufficient to cover personnel and operating expense[s]" but that some users would be entitled to free access. Fees were waived for "school organizations," defined to include "[p]arent-teacher organizations/associations, district organizations, band and athletic booster clubs, SADD, 4-H clubs, FFA and FHA organizations and other similar organizations." In addition, the district waived fees for use "as a result of joint business/education partnerships" with the district and for "[g]overnmental bodies or agencies" under most circumstances. The fee provisions were subject to a best interest catch-all, apparently added to the policy in 2000: "The district reserves the right to . . . waive any or all charges as determined to be in the district's best interest."[1]

In the 2002-03 and 2003-04 school years, groups that paid for the use of school facilities included the Anderson County Disabilities and

---

[1]The discretionary language extends to facility access as well as fees. The policy states that "[t]he district reserves the right to decline any rental application . . . as determined to be in the district's best interest" and that "[t]he school principal must authorize all requests, in advance, for use of his/her assigned facility." The policy also prohibits "any activity that may violate the canons of good morals, manners, or taste." Finally, it states, "The board reserves the right to amend, suspend, or revoke the provisions of this policy at any time it deems necessary to be in the best interest of the district and/or the community."

Special Needs Parent Club, a Kiwanis Club, the Miss Anderson USA Pageant, and a number of churches. The district took in over $40,000 from paying users in the 2003-04 fiscal year, with most receipts coming from church groups, many of which held regular worship services at the schools.

Other groups, however, were given free access. The district waived fees under the "best interest" provision for Boy Scout and Girl Scout troops, as well as the Brownies and the Cub Scouts. School officials stated in depositions that scouting groups were allowed to meet for free because they had done so since at least 1975 — even when district policies provided for fees but not for "best interest" waivers. The YMCA also received free use under Policy KG, apparently under the exception for joint partnerships between private groups and the school district. Other free users included the Anderson County Democratic and Republican parties, apparently on the erroneous grounds that the groups were governmental organizations, and various activities closely tied to the school curriculum, such as an orchestra booster club and a spelling bee.

CEF first applied to hold Good News Club meetings at Midway Elementary School in 2003. CEF asked that any usage fee be waived on the grounds that it would be "in the best interest of the district" — the first such formal request that David Brooks, the district's assistant superintendent for financial services and operations, could recall receiving. The district approved CEF's proposed use, but estimated that the group would be charged $48.00 per week. Brooks denied CEF's request for a fee waiver, citing "the extent and frequency of your planned use of our facilities."

After CEF's district director requested reconsideration, Brooks wrote a second letter explaining the denial. Brooks wrote that while Policy KG made it possible to "waive any or all charges as determined to be in the district's best interest,"

> the only organizations that the District waives the charges for pursuant to this exception are the Boys and Girls Scouts and the YMCA after school program, which began and still

operates as an invited partnership between the District and the YMCA. The District has waived fees for these three groups for many years, apparently since the groups began using District facilities.

He added, "It is the District's practice to charge all groups, other than the long-standing exceptions discussed above, for their usage of its facilities. Deviating from this practice now would set a precedent that would likely lead to unnecessary future problems."

CEF began holding weekly Good News Club meetings and paying usage fees during the 2003-04 school year, but eventually filed this suit under 42 U.S.C. § 1983 challenging the fees facially and as applied on First and Fourteenth Amendment grounds. About two months after CEF filed its complaint, the district replaced Policy KG with "Policy KF," which eliminated the "best interest" waiver provision under which CEF had sought free access. Instead, Policy KF waived fees for groups that began using school facilities "at a time when fees were not charged for such uses or to organizations or groups who have made use of the district's facilities for at least twenty years." The only groups meeting this definition were the scouting organizations. The other provisions governing free use by governmental entities and school organizations remained substantively unchanged.

The school district did not allow CEF free access under the new policy. CEF continued to use the facilities for part of 2004-05, drawing 27 students to a typical meeting. Eventually, however, CEF stopped the meetings, having paid the district a total of $1,545 over two school years. The district court found that cost contributed to CEF's decision to stop holding meetings at Midway Elementary School and prevented CEF from organizing clubs at additional district schools. 438 F. Supp. 2d 609, 617 (D.S.C. 2006).

After the parties withdrew requests for trial by jury, they submitted the case to the district court for decision. The district court framed the issue as one of access to a limited public forum. *Id.* at 628. It concluded that Policy KG's "best interest" waiver provision "left a con-

spicuous door open" for school administrators to deny access based upon viewpoint, contrary to the First Amendment's requirement that the government not discriminate against speakers on the basis of their views. *Id.* at 627. It also held that Policy KF could allow administrators' earlier decisions to be perpetuated. *Id.*

Nevertheless, the district court rejected CEF's First Amendment challenge, because it concluded that the school district had applied the "best interest" provision in a viewpoint-neutral fashion, using it to grant free access only to longstanding users of school facilities. *Id.* at 627. In addition, the court found that CEF did not qualify for free access as a "school organization" and that the school-organization category was reasonably drawn and viewpoint neutral. *Id.* at 628.

CEF filed this appeal. The parties agree that this case presents only questions of law, which we review *de novo*, based upon "an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression," *In re Morrissey*, 168 F.3d 134, 137 (4th Cir. 1999) (internal quotations omitted).

## II.

### A.

"It is axiomatic," the Supreme Court has held, "that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). This does not mean that the government must allow all speech on all of its property at all times, because the state has the "power to preserve the property under its control for the use to which it is lawfully dedicated." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (internal quotations omitted). But it does mean that when the government opens its property to private speech, it may not discriminate based upon the viewpoint of the speaker, and it must also "respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829.[2]

---

[2]The "viewpoint discrimination" prohibited in all forums is "an egregious form of content discrimination" in which the government "targets

The ban on viewpoint discrimination is a constant. Beyond this, speakers' rights depend upon how widely the government has opened its property and its purposes in doing so. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800 (1985); *see also Goulart v. Meadows*, 345 F.3d 239, 248-50 (4th Cir. 2003). In public forums that "by long tradition or by government fiat have been devoted to assembly and debate," speakers' rights are at their apex. *Perry*, 460 U.S. at 45. "[C]ontent-based restrictions on speech are valid only if they are narrowly tailored to serve a compelling state interest." *Goulart*, 345 F.3d at 248. Neutral regulations of time, place, and manner are permitted when they are "narrowly tailored to serve a significant government interest" and "leave open ample alternative channels of communication." *Id.* (quoting *Perry*, 460 U.S. at 45).

At the other end of the spectrum lie nonpublic forums, which are "not open by tradition or designation to the public for expressive activity." *Id.* These forums are defined by "selective access," *Perry*, 460 U.S. at 47, with permission "contingent upon non-ministerial judgments," *Goulart*, 345 F.3d at 250 (internal quotations omitted). The government may draw distinctions based upon "subject matter and speaker identity," but the restrictions must be "reasonable in light of the purpose served by the forum" as well as viewpoint-neutral. *Cornelius*, 473 U.S. at 806.

A limited public forum is a "hybrid" of traditional public and nonpublic forums. *Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch.*, 457 F.3d 376, 382 (4th Cir. 2006) (hereinafter "*CEF of Maryland*"). Limited public forums are characterized by "purposeful government action" intended to make the forum "generally available." *Goulart*, 345 F.3d at 249 (internal quotations omitted). As in nonpublic forums, the state may reserve the forum "for certain groups or for the discussion of certain topics," but it "must not discriminate against speech on the basis of viewpoint," and any restric-

not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. "Content discrimination" includes both viewpoint-discriminatory rules and rules that limit forums to particular subjects, irrespective of viewpoint. *Id.* at 829-30. The government is permitted to set reasonable subject-matter limitations, except in public forums that are opened to all speech by tradition or government decree.

tion "must be reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001) (internal quotations omitted).

### B.

Several corollaries of the prohibition on viewpoint discrimination are relevant to this case. First, government may not bar religious perspectives on otherwise permitted subjects, as it constitutes viewpoint discrimination to permit "the presentation of all views . . . except those dealing with the subject matter from a religious standpoint." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993). Recent Supreme Court decisions establish that any tension between the Establishment and Free Speech Clauses that may have motivated past exclusion of religious groups from government forums is more apparent than real. Government need not fear an Establishment Clause violation from allowing religious groups to speak under the same reasonable, viewpoint-neutral terms as other private parties, even if some speakers are denied forum access under these neutral principles. *See id.* at 394-96; *Rosenberger*, 515 U.S. at 837-46; *Good News Club*, 533 U.S. at 113-19. The decisions also indicate that communities of faith may not be arbitrarily excluded from the protections of the Free Speech Clause, and we review this case with that in mind. *See id.* at 107.

A second corollary of the prohibition on viewpoint discrimination is the principle that administrators may not possess unfettered discretion to burden or ban speech, because "without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763-64 (1988). Without determinate standards,

> *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression. . . . [T]he difficulties of proof and the case-by-case nature of 'as applied' challenges render

the licensor's action in large measure effectively unreviewable.

*Id.* at 758-59. In a standardless environment, speakers might engage in self-censorship out of the fear they would be discriminated against based upon their views. *Id.* at 757. Ascertainable criteria, on the other hand, may protect the government as well as speakers, by giving rise to fewer claims that policies have been applied in a discriminatory fashion and reducing the need for discovery into practices and motives when litigation does occur.

The Supreme Court has specifically prohibited unbridled discretion in traditional public forums. We have further held that since the risks of unbridled discretion "are just as present in other forums," the prohibition is a constant in forum analysis. *CEF of Maryland*, 457 F.3d at 386. This has been a matter of consensus among the courts of appeals. *Id.* at 386-87 (citing *Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1306-07, 1310-11 (11th Cir. 2003); *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572-74 (7th Cir. 2001); *Lewis v. Wilson*, 253 F.3d 1077, 1079-80 (8th Cir. 2001); *Summum v. Callaghan*, 130 F.3d 906, 919-20 (10th Cir. 1997); *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1200 n.11 (11th Cir. 1991)).

Our approach does not mean that traditional public forum cases on administrative discretion can be directly transposed to other forums, because we review all policies "in light of the characteristic nature and function of that forum." *CEF of Maryland*, 457 F.3d at 387 (internal quotations omitted). We have held that the unbridled discretion inquiry is "not a static inquiry, impervious to context," but "even in cases involving nonpublic or limited public forums," if a policy "does not provide sufficient criteria to prevent viewpoint discrimination," then it "generally will not survive constitutional scrutiny." *Id.* (internal quotations and alterations omitted).

### III.

We turn now to applying First Amendment forum analysis to the school district's policies in this case. The district's fee-waiver system is the relevant forum, because the forum is defined "in terms of the access sought by the speaker." *Cornelius*, 473 U.S. at 801; *see also,*

*e.g.*, *CEF of Maryland*, 457 F.3d at 378-79 (analyzing "take-home flyer forum" when school district permitted group to distribute information through several channels but not through take-home flyers). Where the state encourages private speech by making funds available, the money constitutes a forum "more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable." *Rosenberger*, 515 U.S. at 830.

CEF's challenge parallels that in *Rosenberger*. In *Rosenberger*, a university treated a religious organization that published a magazine as free to "exist and operate at the University," *id.* at 824, 826, but denied it a subsidy available to student-run media, *id.* at 827. The court applied forum analysis to the subsidy system. *Id.* at 830-31. Similarly, the district has not denied CEF access to school facilities, but has denied it a speech subsidy in the form of a fee waiver, so the waiver system constitutes the relevant forum. Neither party challenges the district court's holding that limited public forum standards govern the case. *See also Goulart*, 345 F.3d at 250 (holding "two types of government property . . . clearly are limited public fora: public school facilities during after school hours and a student activities fund of a public university.") (footnotes omitted).

A.

The fee-waiver rules of Policy KG that were in effect when this litigation began cannot be squared with the prohibition on unfettered discretion so essential to viewpoint neutrality. Policy KG authorized administrators to waive usage fees "as determined to be in the district's best interest" — conveying, by its terms, an apparent carte blanche. While an adequate policy must contain "narrow, objective, and definite standards," *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969), "the best interest of the district" is as subjective a notion as good government, good taste, or good character, *cf. Schneider v. New Jersey (Town of Irvington)*, 308 U.S. 147, 158, 164 (1939) (finding statute requiring that officer refuse license to canvas if "the canvasser is not of good character" made exercise of liberty "depend[ ] upon the exercise of the officer's discretion").

The "best interest" language of Policy KG is no more definite than "the public welfare, peace, safety, health, decency, good order, morals

or convenience" standard found wanting in *Shuttlesworth*, 394 U.S. at 150, or the rejected provision in *Forsyth County v. Nationalist Movement*, which allowed an administrator to adjust a permit fee "in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed," 505 U.S. 123, 126-27 (1992). Indeed, the Supreme Court offered a modest variation on this "best interest" language as an archetype of excessive discretion in *Lakewood*, where it invalidated a licensing ordinance when "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application."[3] 486 U.S. at 769.

In sum, speech is not to be selectively permitted or proscribed according to official preference. The "best interest" guidelines are "a virtual prescription for unconstitutional decision making," and permit officials to regulate speech "'guided only by their own ideas' of what constitutes the good of the community." *Safir*, 18 F. Supp. 2d at 344 (quoting *Shuttlesworth*, 394 U.S. at 150). Since "[n]othing in the [policy] or its application prevents the official from encouraging some

---

[3]Courts have thus directly condemned "best interest" formulations in the past. *Million Youth March, Inc. v. Safir*, 18 F. Supp. 2d 334, 344 (S.D.N.Y. 1998) (addressing provision that allowed denial of parade permit applications when "approval of the application is not in the best interest of the community, City or general public for reasons that may include, but are not limited to, lack of good character, honesty, integrity or financial responsibility of the sponsor"); *Smith v. Univ. of Tenn.*, 300 F. Supp. 777, 783 (E.D. Tenn. 1969) (addressing policy authorizing university to reject or permit speaker invitations depending on "whether the invitation and its timing are in the best interests of the University"); *Reproductive Rights Network v. President of the Univ. of Mass.*, 699 N.E.2d 829, 834-35 (Mass. App. Ct. 1998) (addressing policy allowing university to deny access to facilities "in the best interest of the University"). While the Ninth Circuit upheld a "best interest" policy, it did so on the grounds that courts must "invest high school educators with greater control over expressive activities that bear the school's imprimatur than other forms of speech or use of government facilities." *Planned Parenthood of S. Nev., Inc. v. Clark County Sch. Dist.*, 941 F.2d 817, 819 (9th Cir. 1991) (en banc). After-school club meetings do not generally carry an official imprimatur, *see Good News Club*, 533 U.S. at 113, and the school district does not claim such a circumstance here.

views and discouraging others through the arbitrary application of fees," *Forsyth*, 505 U.S. at 133, Policy KG did not by its terms provide the standards that the First Amendment requires.

B.

The school district argues not that Policy KG contained adequate standards by itself, but that "well-established practice" adequately narrowed its terms. *Lakewood*, 486 U.S. at 770. The district argues that school administrators implemented the "best interest" waiver provision in a narrow, viewpoint-neutral manner by granting such waivers only to longstanding free users. Aside from longstanding users, the district claims, it granted free use only to "school organizations," meaning groups operated by district schools or sponsored by their principals; joint business/education partnerships; and governmental entities. Since *Lakewood* established that a broad policy can be narrowed by a limiting practice that is "well-understood and uniformly applied" and "has virtually the force of a judicial construction," the district argues that its policy is saved by its practice. 486 U.S. at 770 n.11.

We reject this argument for several reasons. First, the district's limiting construction is not as "uniformly applied" as its argument would suggest: the Anderson County Democratic and Republican parties were given free use of school facilities even though they fall within none of the classes permitted waivers under the district's construction. At oral argument the district characterized such use as premised upon the mistaken belief that parties were governmental entities, but mistaken waivers undermine the district's claim that its limiting construction was "well-understood and uniformly applied." *Id.*

The district's search for a limiting principle in its practice is further hampered by the paucity of past practice with respect to the vague "best interest" provision. CEF's waiver request is the only formal request for a "best interest" waiver that Assistant Superintendent Brooks recalled, and the only challenge to a waiver denial of which he was aware. The district's practice of granting "best interest" waivers to scouting groups and its single denial of a waiver to CEF is a slender reed upon which to rest a claim of "well-established practice."

Even if the record of practice were more robust, we would question its relevance because school officials indicated in their depositions that they saw this practice as an exercise of their discretion, rather than a constraint upon it. Superintendent Betty T. Bagley testified that the scouting groups had not been charged a fee during her tenure because of their longstanding free use, but she did not suggest that she believed administrators could only waive fees for such users. To the contrary, Bagley agreed that Policy KG gave her the authority to waive fees "if [she] determine[d] that something [was] in the best interest of the School District," but said she chose not to exercise that power because "it would be an economical problem for the District" to establish a precedent of waiving the fees here.

Similarly, Assistant Superintendent Brooks' letter denying CEF's waiver appeal indicated that Brooks believed limiting "best interest" waivers to longstanding users was a prudent practice, not a binding one. He wrote, "Deviating from this practice now would set a precedent that would likely lead to unnecessary future problems. Accordingly, based on the District's facilities usage policy . . . it is *my decision* to deny your request to waive the facilities usage fee for the Good News Club weekly meetings" (emphasis added). Indeed, the district indicated in response to interrogatories that a "best interest" waiver also might be called for when a use would produce "direct tangible benefits to the school district," or when an organization was "using the facilities at the District's invitation," contradicting the district's present limiting interpretation.

The district's limiting construction is further undermined by school administrators' correspondence with CEF. Brooks' initial denial of CEF's request made no mention of longstanding use, instead stating, "Considering the extent and frequency of your planned use of our facilities, we will not be in a position to waive the fee." Brooks abandoned this justification in his letter rejecting CEF's appeal, perhaps in part because the scouting groups apparently met more frequently than CEF and at more school locations. But his initial denial on grounds unrelated to CEF's status as a new user again undermines the district's argument that it was a "well-understood" limitation with "virtually the force of a judicial construction" that administrators could only grant "best interest" waivers to established users. *Id.* at 770 n.11. Brooks' shift suggests, to the contrary, that administrators

understood the "best interest" provision to be quite capacious, and as the Eighth Circuit held in striking down a policy for excessive discretion, "The very fact that the [government] could so readily switch justifications for its rejection . . . illustrates the constitutional difficulty with the statute." *Lewis*, 253 F.3d at 1080.

In sum, while administrators may have chosen to grant "best interest" waivers only to longstanding users, there is no indication that they believed their authority to be narrower than the policy's terms indicated. The school district's argument amounts to a claim that administrators "applied legitimate, content-neutral criteria," but as *Forsyth* established, such a claim is "irrelevant," because whether an administrator possesses excessive discretion under the First Amendment depends "not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything . . . preventing him from doing so." 505 U.S. at 133 n.10.

Moreover, while we review discretionary policies "in light of the characteristic nature and function" of the forum, *CEF of Maryland*, 457 F.3d at 387 (internal quotations omitted), and apply principles from public forum cases in a manner "compatible with the intended purpose of the property," *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673 (1998), no special aspect of the fee system justifies the unfettered discretion of its administrators. The district does not claim the forum to be a nonpublic one, such as the candidate debate in *Forbes*, *see id.* at 680, nor does it argue that objective, viewpoint-neutral rules could not readily accomplish the district's stated goal of opening its facilities to the community without subsidizing public use. *Cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586 (1998) (permitting greater administrative discretion for competitive, inherently content-based artistic grant allocations than for "comparatively objective decisions on allocating public benefits such as *access to a school auditorium* or a municipal theater") (emphasis added).

Since "without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker," *Lakewood*, 486 U.S. at 763-64, the absence of constraining standards in the text of Policy KG and in administrators' practice renders Policy KG incompatible with the First Amendment.

## C.

Other terms in Policy KG also give us pause. The authorization of free access by "school organizations," as interpreted by the district, failed to provide the "narrow, objective, and definite standards" that the First Amendment requires. *Shuttlesworth*, 394 U.S. at 151. The term "school organizations" is certainly more susceptible to concrete definition than "best interest," but neither policy nor practice has given the term objective content. Policy KG's non-exclusive list of organizations "included" in the "school organization" category — "[p]arent-teacher organizations/associations, district organizations, band and athletic booster clubs, SADD, 4-H clubs, FFA and FHA organizations and other similar organizations" — suggests the phrase might refer to groups whose mission is to support district schools and to groups that are extracurricular extensions of traditional classroom subjects. But the policy does not require this construction, as it omits any definition of "school organization" and "other similar organization."

Fatally, school officials declined to embrace this or any other limiting construction. Assistant Superintendent Brooks and Superintendent Bagley said in their depositions that principals determine which groups qualify as school-sponsored. While Bagley said that "[u]sually" principals sponsor activities "that directly relate to the curriculum of the individual grades and to the mission of their schools," both Bagley and Brooks indicated that principals are free to decide which groups qualify, and neither official identified further guidelines constraining principals' determinations. Even in litigation, the district has embraced a definition of school organizations as including all "organizations sponsored by school principals."

We agree with the district court that as a result, the "school organizations" provision creates "the potential for a school principal to discriminate on the basis of content or viewpoint in determining whether to sponsor an organization," because "the principals appear to have discretion over whether to sponsor an organization." 438 F. Supp. 2d at 635. As a further avenue through which "[t]he decision . . . whether to charge at all" for use of school facilities is "left to the whim of the administrator," we find this provision incompatible with the First

Amendment, which "prohibits the vesting of such unbridled discretion in a government official." *Forsyth*, 505 U.S. at 133.

IV.

The district next argues that even if its fee-waiver system initially failed to adequately cabin discretion, it remedied this problem in Policy KF by eliminating the "best interest" waivers. In their place, the district added waivers for groups whose "use of the district's facilities began at a time when fees were not charged for such uses" and for groups that "have made use of the district's facilities for at least twenty years." The fact that this revision occurred while CEF's lawsuit was pending suggests that the change may not have been inspired by a sudden commitment to First Amendment values, but "[e]ven when litigation prompts the change, if a revised policy passes constitutional muster, a court will not penalize the government for transgressions under an earlier policy." *CEF of Maryland*, 457 F.3d at 386.

Although the new policy is an improvement, it remains deficient. First, the new policy continues to authorize free access by "school organizations," with principals possessing total control over which groups qualify. In addition, the new policy incorporates inadequately constrained judgments made under the old policy in several ways. It appears to grant free use to any group that received a "best interest" waiver when it began use of school facilities, because such a group's activities would have "beg[u]n at a time when fees were not charged for such uses." It thus seems to incorporate "best interest" determinations by reference, denying CEF a fee waiver based upon the very "best interest" judgments under Policy KG that rendered the old policy unconstitutional.

Furthermore, scouting groups accumulated twenty years of use without ever having to pay a fee in part because they received waivers under Policy KG and were apparently not charged fees prior to the enactment of the "best interest" provision. CEF, in contrast, was charged for access when the "best interest" waiver provision was in effect, and there is no reason to imagine CEF would have been granted an informal fee waiver under the prior policy. The district's fees were substantial — CEF paid $1,545 over parts of two school years. And CEF decided to stop meeting in part because of cost, sig-

naling that the fees posed a genuine obstacle to the use of school facilities. Since the old policy made it far easier for beneficiaries of impermissibly discretionary fee decisions to become longstanding users than for others to do so, the new policy errs by making free access contingent upon longstanding use.

Our analysis parallels that of the Seventh Circuit in *Southworth v. Board of Regents of the University of Wisconsin System*, 307 F.3d 566 (2002), which invalidated a policy linked to a constitutionally flawed predecessor. *Southworth* rejected a system in which grants were allocated in part based upon "[c]onsideration of the length of time that [a group] has been in existence and the amount of funding the [group] received in prior years," noting,

> until recently there were no procedures designed to assure the distribution of funds in a viewpoint-neutral manner. Thus, to the extent that the current funding decisions are based on the length of time an organization has been in existence, or the amount of funding that the [group] received in the past, the current decisions depend in part on viewpoint-based decisions of the past.

*Id.* at 593-94. We must likewise reject the school district's new guidelines because potential "viewpoint discrimination from past years has been institutionalized into the current system." *Id.* at 594.

V.

Anderson School District Five's policies set forth time-honored objectives that the First Amendment does not call into question. The Constitution does not prevent the district from opening its buildings for community use or from recouping the costs of this service. It does not require that the district adopt any particular concrete, reasonable, and viewpoint-neutral set of rules to govern access — it simply requires that the district adopt some such neutral system of its own choosing. We do not expect the district to speak with perfect precision or account for every contingency. But neither can the Constitution's promise that a speaker's access to government property will not be granted, denied, burdened, or subsidized because of the speaker's views be made to depend solely upon the good faith of state officials.

Because the administrative discretion at the core of the school district's policies exceeds the bounds permitted by the First Amendment, the judgment of the district court is reversed and the case is remanded for a refund of CEF's usage fees, and such other relief as the district court determines is appropriate and consistent with this decision.[4]

*REVERSED AND REMANDED*

[4]As a prevailing party, the plaintiff shall also be awarded reasonable attorneys' fees. *See* 42 U.S.C. § 1988.